**Loyd OSBORN, doing business as Osborn Construction Company, Appellee,**

**v.**

**COMMANCHE CATTLE INDUSTRIES, INC., a/k/a Commanche Feeding Corporation, doing business as Commanche Feeders, Appellant.**

**No. 48085.**

Court of Appeals of Oklahoma,
Division No. 1.

Nov. 25, 1975.

Released for Publication by Order of Court
of Appeals Dec. 18, 1975.

Tryon, Sweet, Field & Petty, by James R. Fletcher, Guymon, for appellee.

Loofbourrow, Loofbourrow & Manske, by Robert H. Loofbourrow, Boise City, for appellant.

BOX, Judge:

An appeal by Commanche Cattle Industries, Inc., defendant in the trial court, from a judgment rendered upon a jury verdict in favor of appellee, Loyd Osborn.

Loyd Osborn brought this action against Commanche Cattle Industries, Inc. (Commanche) in the District Court of Cimarron County, seeking recovery of monetary damages for breach of contract. The case was submitted to a jury and a verdict in the amount of $30,000 was returned in favor of Osborn. The question dispositive of Commanche's appeal is whether Osborn was entitled to recover lost profits.

In 1970 and 1971 Commanche owned and operated two feedlots in Oklahoma: a Texas County lot known as "Sooner Beef" and a Cimarron County lot known as "Commanche Feeders." Osborn's first business dealings with Commanche occurred in 1970, when Commanche hired Osborn, who is a dirt and fertilizer contractor, to periodically haul manure from and perform other services at the Sooner Beef lot. During that year Osborn was also hired to do occasional work at the Commanche Feeders lot and his contacts with its manager led to negotiations for a contract under which Osborn would clean the Commanche Feeders' pens, stockpile and dispose of manure and perform various other functions. These negotiations ultimately led to the execution of a written agreement between Osborn and Commanche on July 1, 1971. The agreement required Osborn to perform substantially

the same services at the Commanche Feeders' lot that he had been discharging at the Sooner Beef lot. The pertinent parts of the agreement are as follows:

"For and in consideration of the promises hereinafter made by each party to the other, and the mutual benefit to be derived by each from the performance thereof, the parties hereto agree as follows:

"1. Commanche Feeders now owns the manure that has been piled in the pens for mounds, and will always need mounds left in the pens, the size of same to be agreed on between Commanche Feeders and Osborn.

"2. The pens may be used as stockpiling areas for future manure plus Commanche Feeders will furnish an area acceptable to both parties for some manure stockpiling aging and conditioning, so as not to interfere with the feed yard operation. Commanche Feeders agrees that manure, with the exception of a basic mound will become the property of Osborn to be disposed of as Osborn sees fit.

"3. Commanche Feeders agrees that Osborn shall have access to and egress from the premises to allow its convenient removal of manure from pens from stockpiling area. Weighing of manure on Commanche Feeders scales to be free of charge to Osborn.

"4. Osborn agrees to clean pens at least twice each year, and whenever else Commanche Feeders so requests, if it becomes necessary to promote safe and sanitary conditions required for reasonable and prudent feed yard operations. Removal of manure and cleaning of pens, Osborn agrees, shall be done at a time mutually convenient to Osborn and Commanche Feeders and in a workmanlike manner, but does not necessarily need to remove manure twice a year for sale.

"5. This agreement shall continue, unless terminated earlier as hereinafter

provided, for a term of three years beginning 1st day of July, 1971 and ending 1st day of July, 1974. Should Osborn hold over and continue in possession, performance, and as otherwise on the terms and conditions herein specified after 1st day of July, 1974, with the expressed or implied consent of Commanche Feeders thereto, such shall be construed as an extension of this agreement from month to month.

"6. Osborn will provide the following equipment for removing manure from the Commanche Feeders pens:

3—John Deere Elevator Scrapers

1—Grader

The elevator scraper will be valued at $15 per hour and the grader will be valued at $12.50 per hour. Commanche Feeders agrees to pay 50% or $7.50 per operating hour for each elevator scraper and $6.25 per operating hour for the grader. Hours will be determined by the hours registered on the hour meter of the John Deere elevator scrapers, and turned in weekly to Commanche Feeders. The form will be furnished by Commanche Feeders. Hours for the grader will be kept by Osborn and Commanche Feeders and compared for billing weekly. Payments will be made at the end of each month for that month's work. Commanche Feeders is to be notified when the above equipment is taken from the premises for other jobs. From time to time, both parties will review the costs and expenses connected with their respective operation and if it becomes apparent that some revisions or adjustments are required in this agreement to compensate one or the other for increases in such expenses, both parties will negotiate in good faith in a reasonable effort to meet the requirements of the other.

"7. *Either party may terminate agreement at any time by giving thirty (30) days advance notice.* Osborn shall have two years after termination within which to remove manure from stockpiled

area on the premises, failing in which, Osborn ownership there shall cease and terminate and revert to Commanche Feeders." (Emphasis ours.)

After execution of the agreement both parties reached the conclusion that the Commanche Feeders lot did not require Osborn's services until later that year and consequently agreed that Osborn would commence performance when the manager felt it necessary. Osborn immediately began to purchase equipment in reliance on the contract. At the same time Commanche, without informing Osborn, began negotiations for the sale of the lot. As negotiations progressed it became apparent to the feedlot manager that the lot would be sold and for that reason he delayed plans for Osborn to begin work at the Commanche Feeders' lot. The lot was sold on September 1, 1971. Osborn was never given formal notice of the sale or termination of the agreement and continued to purchase equipment for use at the Commanche Feeders' lot. It is not clear when Osborn finally learned of the sale, but apparently sometime in late September or early October, 1971 the feedlot manager informed him.

After learning of the sale Osborn visited the lot and was told by the new manager that he knew nothing of Osborn's contract with Commanche, that the new management had hired someone else for the work at a cheaper price and that he would take the matter up with his employers.

It soon became apparent to Osborn that no one was going to honor his contract with Commanche and he brought suit for breach, seeking $35,000 in consequential damages to his business and $49,000 for profit he allegedly would have gained over the contract term but for Commanche's breach.

## I.

Commanche filed a motion for summary judgment and, at trial, a demurrer to the evidence, on the ground that the contract was terminated as a matter of law when

Osborn learned of the sale and that Osborn consequently had no cause of action for breach of contract. The contract unquestionably permitted either party to terminate at any time "by giving thirty (30) days advance notice." But it is uncontroverted that Commanche never gave Osborn formal notice. The only basis for Commanche's argument, therefore, is that Osborn received actual notice of Commanche's intent to terminate when he knew that the lot was sold or at least by the time he visited the feedlot and talked with the new manager.

■ We cannot agree with this contention. When businessmen bargain for an option to terminate their contractual relationship, each is entitled to expect that the other will either perform or terminate exactly as agreed. They are entitled also to expect that they will be compensated for the breach of such a contractual obligation. Accordingly, the weight of authority is clearly to the effect that notice to terminate a contract must be in accordance with the contract's express terms. 17A C.J.S. Contracts § 402. No particular form of notice is prescribed by the contract in the instant case but it clearly requires *thirty days advance notice*. At no time after the execution of the contract did Commanche give such advance notice. Consequently, we hold that the trial court correctly concluded that the option to terminate was never exercised and that Osborn had a cause of action for total breach of contract.

## II.

The trial court allowed Osborn to put on considerable evidence regarding his loss of profits and gave the jury instructions to the effect that it could award him monetary damages for loss of profits determined by (1) his loss of earnings from "machine hire" or the stipulated payment for his work with the scrapers and grinding equipment (paragraph 6 of the agreement), and (2) the gross amount of income which would have been realized over the

entire term of the contract from the sale of manure. Commanche challenges these instructions and the admission of evidence regarding lost profits, on the ground that Osborn's evidence of profits was too speculative and that he was entitled only to nominal damages in any event because the contract was terminable by either party for any reason upon 30 days written notice.

In *Groendyke Transport, Inc. v. Merchant,* 380 P.2d 682, the Supreme Court of Oklahoma held:

> "Loss of future or anticipated profits, if within the contemplation of the parties at the time contract is made and flowing directly or proximately from breach of contract, and capable of reasonably accurate measurement or estimate, is recoverable in an action for breach of contract."

In the instant case the problem is really not whether Osborn's evidence was necessarily too speculative and uncertain but whether the breach entitled him to recover the profits he allegedly would have realized if the contract were performed for the entire three year term, even though the contract was terminable by either party upon thirty days notice. The courts of other jurisdictions are virtually unanimous in holding that breach of a contract terminable at any time upon notice entitles the aggrieved party to recover only those net profits which he could have earned during the notice period; he may not recover profits for the entire term of the contract. See 25 C.J.S. Damages § 74 (1966), at page 853.

The courts have advanced different reasons for so narrowly circumscribing the period of recovery. Many rely solely on the analogy to the employment contract cases holding that the servant may recover only nominal damages upon wrongful discharge. See Sedgwick on Damages § 668. Others rely on the more persuasive reasoning of the Ninth Circuit in *Chevrolet Motor Co. v. McCullough Motor Co.,* 6 F.2d 212, that the plaintiff should not "by reason of the defendant's breach, acquire rights greater than those which the contract gave it." In the later cases the concern has been that a party to a contract terminable by either party upon notice is never assured of performance for any time longer than the period of notice for which he bargained.

The law of damages permits recovery of lost profits to protect the injured promisee's "expectation interest," his prospect of net gain from the contract. 22 Am.Jur.2d Damages § 47 (1965); Fuller and Purdue, *The Reliance Interest in Contract Damages: 1,* 46 Yale L.J. 52 (1936). See also Farnsworth, *Legal Remedies for Breach of Contract* 70 Colum.L.Rev. 1145 (1970). This interest is given legal protection to achieve the paramount objective of putting the promisee injured by the breach in the position in which he would have been had the contract been performed. *Interstate United Corp. v. White,* 388 F.2d 5 (10th Cir.); *Red Eagle v. Free,* 191 Okl. 385, 130 P.2d 308 (Okl.). But the protection of the promisee's expectation interest extends no further; he may not recover more than the amount he might have gained by full performance. *Red Eagle v. Free,* supra. We think that the only legally protectible expectation interest in the party to a contract terminable by either party upon notice is the prospect of profit over the length of the notice period. Since his assurance of performance never extends beyond the length of the notice period neither does his prospect of net gain. And allowing him under such circumstances to recover the profit he purportedly could have gained over the *maximum* life of the contract would be contrary to the whole purpose of permitting recovery of lost profits. Accordingly we hold that the trial court erred by admitting evidence regarding Osborn's loss of profits over the three year term and by instructing the jury it could award him the profits he allegedly lost over the entire contract term. Osborn would have been entitled, assuming sufficient evidence had been produced, to an instruction permitting recovery of lost prof-

its for the length of the notice period—or thirty days from Commanche's breach of contract. See *Purnell v. Atkinson,* 451 S. W.2d 734 (Ark.); *Fife v. Great Atlantic & Pacific Tea Co.,* 166 Pa.Super. 77, 70 A.2d 369; *Des Moines Blue Ribbon Distributors, Inc. v. Drewrys Limited, USA, Inc.,* 256 Iowa 899, 129 N.W.2d 731; *California Wine Ass'n v. Wisconsin Liquor Co. of Oshkosh,* 20 Wis.2d 110, 121 N.W. 2d 308.

### III.

Since this case must be remanded for a new trial we note that Osborn's recovery is not limited exclusively to the net profits he would have realized in the thirty day period following Commanche's breach. The law also seeks to protect a promisee's "reliance interest" or the detriment he incurred by changing his position in reliance on the contract, Fuller and Purdue, supra; and he is therefore entitled to recover his expenses of preparation and of part performance, as well as other foreseeable expenses. *St. Louis-S. F. Ry. Co. v. Farmers' Union Gin Co.,* 34 Okl. 270, 125 P. 894; *Vitagraph-Lubin-Selig-Essanay v. Billings,* 87 Okl. 192, 209 P. 773. See generally, McCormick, Damages § 583 (1935); 22 Am.Jur.2d Damages § 161 (1965). Those direct expenditures necessary to perform the contract for the notice period—the expenses Osborn would have even if the contract were fully performed—are computed in determining net profits and thus cannot be awarded again as reliance expenses, because such reliance expenses would be included in the award for lost profits. *Vitagraph-Lubin-Selig-Essanay v. Billings,* supra; McCormick, supra, at page 583; Fuller and Purdue, supra, at 78. But Osborn's overall expenses of preparation, as well as his expenses in pursuance of reasonable efforts to avoid or minimize the damaging effect of Commanche's breach, to the extent that they were both reasonable and foreseeable, may be recovered. Among other things, this figure will include the depreciation in the market value of the equipment Osborn purchased in reasonable reliance on the contract, computed from the dates of purchase to 30 days beyond the date of breach.

There are other propositions of error but we find it unnecessary to dispose of them in view of the disposition of this appeal.

The judgment of the trial court is reversed and this cause is remanded for a new trial consistent with the rulings herein.

Reversed and remanded.

ROMANG, P. J., and REYNOLDS, J., concur.