**FLORAFAX INTERNATIONAL, INC.,**
**Appellee/Counter–Appellant,**

v.

**GTE MARKET RESOURCES, INC.,**
**Appellant/Counter–Appellee.**

No. 82811.

Supreme Court of Oklahoma.

Jan. 28, 1997.

Ira L. Edwards, Jr. and C. Michael Copeland, Jones, Givens, Gotcher & Bogan, Tulsa, for Appellee/Counter–Appellant.

Claire V. Eagan and William G. Bernhardt, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, for Appellant/Counter–Appellee.

LAVENDER, Justice.

We consider the appropriateness of a jury award of lost profits over a two year time period in favor of appellee/counter-appellant, Florafax International, Inc. against appellant/counter-appellee, GTE Market Resources, Inc., for breaching a contract requiring GTE to provide telecommunication and/or telemarketing services for Florafax. The profits were those Florafax claimed it stood to make from a collateral contract it had with a third party, but allegedly lost when the collateral contract was canceled purportedly because GTE breached its contract with Florafax. The Court of Civil Appeals reversed the lost profit award—remanding with instructions for a determination of lost profits incurred during a sixty (60) day period, a time frame chosen on the basis the collateral contract contained a clause allowing either party to it to terminate the collateral contract on sixty (60) days notice. Both parties sought certiorari, Florafax claiming error by the Court of Civil Appeals in limiting lost profits to a sixty (60) day period and GTE attacking the propriety of any lost profit award.

We previously granted both parties' petitions for certiorari and now hold the Court of Civil Appeals erred in limiting lost profits as it did.[1] Instead, we hold the award of lost

---

1. In addition to reversing the lost profit award, the Court of Civil Appeals affirmed the jury verdict insofar as it awarded damages to Florafax for costs primarily associated with setting up its own telecommunication/telemarketing service to perform the work GTE was supposed to perform, in an effort to retain business other than that associated with the collateral contract. The Court of Civil Appeals also affirmed a post-trial order denying Florafax attorney fees, and reversed another post-trial order denying GTE prejudgment interest on damages awarded in its

profits was consistent with our substantive law and was supported by competent evidence. Therefore, we vacate the Court of Civil Appeals' Memorandum Opinion to the extent it disturbed the jury's verdict and trial court's judgment as to the award of lost profits. Instead, we affirm that part of the judgment awarding lost profits based on the jury's verdict.

## I. STANDARD OF REVIEW.

In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, this Court will not disturb the jury's verdict or the trial court's judgment based thereon. *Hames v. Anderson*, 571 P.2d 831, 833 (Okla.1977); *Wat Henry Pontiac, Inc. v. Pitcock*, 301 P.2d 203, 204 *Fourth Syllabus* (Okla.1956). Where such competent evidence exists, and no prejudicial errors are shown in the trial court's instructions to the jury or rulings on legal questions presented during trial, the verdict will not be disturbed on appeal. *Lawton Refining Co. v. Hollister*, 86 Okla. 13, 205 P. 506 *Second Syllabus* (1922). In an appeal from a case tried and decided by a jury an appellate court's duty is not to weigh the evidence and determine which side produced evidence of greater weight [*Tapley v. Patton*, 349 P.2d 507, 508 (Okla.1960) ], i.e. it is not an appellate court's function to decide where the preponderance of the evidence lies—that job in our system of justice has been reposed in the jury. In a jury-tried case, it is the jury that acts as the exclusive arbiter of the credibility of the witnesses. *Holley v. Shepard*, 744 P.2d 945, 947 (Okla. 1987). Finally, the sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it. *Park v. Security Bank and Trust Company*, 512 P.2d 113, 118 (Okla. 1973).

## II. FACTS.

Florafax is generally a flowers-by-wire company acting as a clearinghouse to allow the placement and receipt of orders between florists throughout the United States and internationally. Basically the system works as follows: retail florists become members of the Florafax network (apparently, thousands of retail florists join Florafax's wire service). Florafax maintains a list of the members and circulates a directory to them. The members are then able to send and receive orders among each other throughout the system. In other words, a consumer orders flowers at a retail florist at a certain location (e.g. Oklahoma City) to be delivered to someone in another location (e.g. Los Angeles). Florafax assists the transactions by collecting money from the florist taking the order from the customer and guarantying payment to the florist delivering the flowers. It processes the credit card activity on the transactions and charges a fee or fees for this service. Florafax also maintains a computer network whereby member florists can send and receive orders by computer—if they have such technology—without using the telephone. It also has a division that advertises floral products by the use of brochures, and other sales and promotional materials, allowing consumers to place a telephone order for floral products directly without going through a florist in their hometowns.

Evidence at trial showed at the time the agreements giving rise to this dispute were entered that Florafax was one of the largest floral wire services of its kind in the nation, and, in fact, certain evidence placed it third world-wide behind Florists' Transworld De-

favor against Florafax for unpaid invoices claimed as part of a counterclaim and attorney fees and costs associated with the counterclaim. Various issues have been raised in the certiorari submissions relating to these other rulings. Our July 10, 1995 certiorari grant encompassed these other matters. We now decide to limit our review to only the issues raised on certiorari that pertain to the propriety of the award of lost profits associated with the collateral contract. Accordingly, our previous grant of certiorari as to any other issue is withdrawn as improvidently granted, certiorari is denied as to all such other issues and the Court of Civil Appeals' decision on these other issues shall stand. Finally, we have decided to order the Court of Civil Appeals' Memorandum Opinion of April 4, 1995 to be withdrawn from publication.

livery Association (FTD) and a company known as Teleflora. Evidence also showed Florafax had been headquartered in Tulsa, Oklahoma since, at least, 1979.

In addition to the above activities, Florafax solicits agreements with third party clients such as supermarket chains, American Express and other entities that advertise the sale of floral products by various methods (e.g. television, radio, newspapers, billing circulars, mass mailings to consumers) which allow a consumer to order floral arrangements via the use of a 1–800 telephone call, with Florafax agreeing to handle the actual inbound and outbound communication aspects of the transactions. In other words, when a consumer responds to an advertisement, it is not the advertiser that answers the telephone call to take the order, or that makes a telephone call or computer communication to a retail florist for fulfillment, but it is Florafax who handles these activities. Such orders would, of course, be fulfilled, if possible, by retail florist members taken from the Florafax directory maintained by it and, again, Florafax would handle the mechanics of processing the transactions, e.g. credit card processing. The advertiser would pay Florafax a certain fee or fees for its services.

One client that signed up for an arrangement like that described immediately above was Bellerose Floral, Inc., d/b/a Flora Plenty, a leading marketer of floral products advertising sales through use of the telephone number 1–800–FLOWERS. Florafax and Bellerose entered a contract in early October 1989 whereby Florafax and/or its designee would accept direct consumer orders (i.e. inbound calls and orders) placed via the 1–800–FLOWERS number and, of course, it also agreed to handle the outbound placement of orders either by telephone or computer transmission. The Florafax/Bellerose contract provided Florafax would be paid certain fee(s) per order. As we read the contract its initial term was for one year, to be automatically renewed from month to month thereafter, but that either party, with or without cause, could terminate the agreement upon sixty (60) days written notice.

GTE, on the other hand, was a company providing telecommunication and/or telemarketing services for other businesses. It provided for other businesses a call answering center where telemarketing sales representatives (TSRs) physically answered telephones when orders from promotional activities came in from consumers and took care of transmitting the orders by telephone or computer for fulfillment. For certain management and business-related reasons Florafax subcontracted out much of the telecommunication and telemarketing services of its business.

In mid-October 1989, about two weeks after Florafax signed its agreement with Bellerose, the Florafax/GTE contract was entered. In essence, it provided GTE would via a call answering center (apparently located in the Dallas, Texas area) handle much, if not all, of the activities connected with taking incoming orders and placing outgoing calls or computer transmissions directed to it by Florafax associated with the purchase and fulfillment of floral orders throughout the United States and internationally. The agreement required Florafax to pay GTE certain fees for this service depending on the type of order.

The Florafax/GTE contract generally ran for a term of three years from the effective date the parties anticipated Florafax would begin directing calls to GTE for floral orders—a date anticipated to be in early December 1989. It also contained certain provisions that in essence might result in termination after a two year period based upon application of a price/fee renegotiation clause. In answer to one of the questions submitted via a special verdict form, the jury determined the Florafax/GTE contract could be terminated after two years based on this clause.

■ The contract further contained a clause concerning *lost profits* providing in pertinent part:

20. *Termination*

a. *Termination for cause* Any non-defaulting party shall have the right to terminate this agreement at any date not less than forty-five (45) days after an event of default occurs and so long as it continues. In the event GTE[ ] ceases to per-

form its duties hereunder after a notice of termination is given or otherwise, Florafax may suffer tremendous damage to its business. GTE[ ] agrees to pay Florafax consequential damages and lost profits on the business lost.[2]

The contract also specifically noted GTE would be providing services not only for Florafax, but for others.

In addition to the above express contractual provisions, evidence was presented that officials with GTE knew prior to signing the contract that GTE would be providing its services not only directly for Florafax, but that Florafax had been soliciting business from entities such as Bellerose, business that was anticipated to be at least partially directed through GTE's call answering center. In fact, competent evidence exists in this record showing GTE specifically knew when it signed the contract with Florafax that Bellerose was considering turning over a portion of its inbound and outbound business to Florafax, and that Bellerose received somewhere between 100,000–200,000 orders annually. Evidence was also presented that showed GTE, prior to contract execution, considered it a positive aspect of entering the agreement that Florafax was constantly marketing and promoting its business by the addition of outside clients and that this addition of clients would lead to revenue increases. Evidence also existed that Bellerose was Florafax's largest customer and that it had been an ongoing business for at least sixteen (16) years prior to the date of trial.[3]

Evidence was also submitted showing that before GTE entered the contract, its director of finance and administration did a financial analysis of the Florafax/GTE contract and determined GTE would make little or no money from it. His immediate supervisor (the general manager of GTE) was informed of the analysis. GTE, however, made the decision to enter the contract, apparently because it needed new customers and/or in the hope this financial analysis was wrong.

Although from December 1989 through Valentine's Day in February 1990 certain problems surfaced in regard to the adequacy of GTE's performance, at some point after Valentine's Day the problems appeared to worsen. At some time after Valentine's Day and leading up to Mother's Day in May 1990, the latter holiday being described as the largest floral holiday of the year, the adequacy of GTE's performance became subject to serious question. What appears from the evidence to be the most glaring breach on GTE's part was a failure during the week leading up to Mother's Day to provide sufficient TSRs to answer calls anticipated to be directed to it by Florafax, including calls from Bellerose. Without adequate TSRs to take the calls, floral product orders would obviously be lost and Florafax income lost in the process.

Coupled with this evidence of a failure to adequately staff for anticipated calls, there was also evidence that during the term of the contract GTE's project manager for the Florafax account admitted to Florafax's off-site manager stationed at the GTE facility to look out for Florafax's interests there, that GTE no longer wanted the Florafax account—in essence, because GTE was not making money under the contract's pricing scheme. This same Florafax employee was also told by the same GTE project manager and another employee of GTE that GTE would not provide sufficient numbers of TSRs for the Florafax project essentially for the same reason, i.e. GTE was not making money on the project

---

**2.** In at least one of its appellate submissions GTE has argued Florafax may not rely on the just quoted contract clause to support its claim to lost profits because Florafax never relied on the clause in the trial court. GTE is mistaken. First off, the entire contract between GTE and Florafax was admitted in evidence at trial. Second, Florafax did rely on the clause at trial. It was specifically referenced during the testimony of the first witness presented by Florafax, a Mr. Ron Fore, a vice-president and secretary of Florafax. Third, as will be seen in our analysis of this case, competent evidence existed, if believed

by the jury, which was sufficient to show the clause was implicated. Essentially, the evidence was that during part of the life of the Florafax/GTE contract, GTE intentionally failed to perform its duties under the contract in an effort to force Florafax into renegotiating the pricing schedule contained in the contract.

**3.** Trial evidence also showed that at the time of trial Bellerose had been rolled into another company going under the name Teleway, Inc.

under the pricing terms in the contract. Evidence also showed that as early as April 1990 GTE was requesting from Florafax a change in the pricing terms of the contract, but that such change was never finally agreed to by Florafax. In effect then, there was both direct and circumstantial evidence tending to show that GTE intentionally failed to adequately perform its duties and obligations under its agreement with Florafax to provide telecommunication/telemarketing services in an effort to coerce Florafax into agreeing to a price renegotiation adjustment not required under the terms of the contract. Although other evidence from GTE disputed the evidence of Florafax that GTE intentionally failed to provide sufficient staffing for Florafax at its call answering center, as noted in I. STANDARD OF REVIEW, as an appellate court we are in no position to weigh the evidence in such regard—that responsibility belonged to the jury.[4]

In addition, evidence was presented that GTE's failure to perform caused Bellerose to terminate its agreement with Florafax and Bellerose ceased its relationship with Florafax apparently some time in July 1990, directing no more calls from its 1–800–FLOWERS number through GTE after that time. The President of Bellerose essentially testified that he anticipated his agreement with Florafax to be a long-term relationship if things worked out and, although his testimony was not absolute in such regard, that he pulled out of his relationship with Florafax because of the poor performance of GTE. In such latter regard, although the President of Bellerose acknowledged that he was also upset with Florafax, primarily because it did not manage the situation with GTE in such a way to insure adequate performance, we believe a reasonable conclusion from his testimony was that, the inadequate performance of GTE was the direct cause of Bellerose's decision to terminate the Florafax/Bellerose contract and that had GTE adequately performed, the relationship between Florafax and Bellerose would have been a long-term

one, rather than being canceled in July 1990. Clearly, the evidence does not show any other major factor connected with Bellerose's termination of its relationship with Florafax other than the insufficient performance by GTE of duties and obligations it was required to perform under its contract with Florafax. In fact, the President of Bellerose testified that the most important issues leading to Bellerose's decision to terminate its relationship with Florafax were the performance issues—i.e. performance that was directly the responsibility of GTE under the Florafax/GTE agreement.

As a result of GTE's breach, in addition to losing Bellerose as a client, Florafax incurred costs primarily associated with taking steps necessary to set up its own call answering center in Tulsa to perform the duties GTE was supposed to handle so that it would not lose other clients or business relationships as it had lost Bellerose. Florafax finally left the GTE facility at the end of September 1990.

In addition to seeking damages attributable to costs associated with performing the services GTE was supposed to perform, Florafax sought lost profits it claimed would have been realized from the Florafax/Bellerose contract. In support of and in opposition to the lost profit claim the parties presented conflicting economic projections through expert witnesses (Florafax through an economist, GTE through a Certified Public Accountant) as to how much profit, if any, Florafax would have made from the Bellerose contract over varying lengths of time. Although the two experts differed on certain aspects of their formulations (e.g. sale close ratios and percentage increase, if any, of Bellerose business) the projections were basically grounded on the pricing terms of the Florafax/GTE contract and projections of the number of Bellerose orders. A starting point for the latter projections had as their basis the number of calls actually received by GTE from Bellerose customers during the five to seven month period Bellerose calls

---

4. We caution to note that we do not mean to intimate that GTE never adequately performed its duties or obligations as per the terms of the Florafax/GTE contract. However, as noted in the text, there is sufficient competent evidence in the record to support a finding that at certain times—important times in the floral product industry by its nature—that GTE intentionally failed to adequately perform duties and obligations it was contractually required to perform.

and orders were actually being handled at the GTE facility.

One major difference between the experts' projections was that the Florafax expert increased the Bellerose sales volume from 1990 to 1991 one hundred percent (100%), while the GTE expert kept the call and order volumes flat in his projections. The one hundred percent (100%) increase was based on evidence the Bellerose sales volume increased about this percentage over the 1990 year levels. GTE's expert, in contrast, used a flat growth rate because a general floral industry survey indicated declining volumes in the floral industry from the late 1980s through 1991.

■ The Florafax expert estimated the Bellerose loss at $1,921,028.00 for a period extended out to three years, i.e. for the period of time that remained in the term of the Florafax/GTE contract at the time Bellerose canceled. The GTE expert estimated the Bellerose loss over the same time frame to be $505,731.00 if the fees to be paid to GTE by Florafax remained constant for this period of time. The GTE expert also gave an alternative figure that coincided with the remaining part of a two year period beginning in December 1989 based on the view the Florafax/GTE contract would be subject to termination at such time in view of the price renegotiation provisions of that contract. The loss of profits for this period was estimated to be $294,044.00. These figures of the two experts took into consideration that the fees Florafax had to pay to GTE for its services would have to be deducted from the income or revenue Florafax would have received from Bellerose orders.[5]

The jury determined GTE breached its contract with Florafax and, in addition to other damages, awarded Florafax $750,000.00 in lost profits that would have been earned under the Florafax/Bellerose contract over a two year period of time. Other damages awarded to Florafax included a little over $820,000.00, the majority of which reflected costs and expenses associated with setting up and/or expanding a call center in Tulsa, Oklahoma to perform those functions GTE was supposed to perform under the Florafax/GTE contract. On appeal, GTE, although not admitting liability—i.e. that it breached its contract with Florafax—does not contest the jury determination that it did breach the contract. We now turn to the lost profit damage issues to be reviewed.

## III. LOST PROFITS FROM A COLLATERAL CONTRACT MAY BE RECOVERED AS A PROPER ELEMENT OF DAMAGE FOR BREACH OF CONTRACT.

GTE raises two basic arguments on the propriety of the recovery of lost profits. These are: 1) lost profit damages cannot include profits from third-party collateral contracts or, if they are recoverable, Florafax failed to prove entitlement to them because it failed to show the prospect of profits from the Florafax/Bellerose contract or, conversely, the loss of such profits upon GTE's breach, were in the contemplation of GTE and Florafax at the time they entered the Florafax/GTE contract; and, 2) if lost profits from the Florafax/Bellerose contract are re-

5. Although there was some dispute as to whether Florafax's expert properly deducted all of the expenses that should have been deducted to reach a net lost profit figure, it is clear from the evidence that the amounts reflected in the text from both experts did take into consideration the necessity of deducting the fees that Florafax would have had to pay to GTE for its services. Of course, only net profits—as opposed to gross profits—are recoverable and depending on the particular transactions involved, what does or does not have to be deducted to reach a net lost profit figure may vary. See H. HUNTER, MODERN LAW OF CONTRACTS, Breach & Remedies, ¶ 7.03[4][c] at 7–20/7–23 (1986). GTE, on appeal, does not attack the lost profit award on the basis that it is not a net figure. We also note that the expert for GTE gave other alternative estimates of lost profits which included estimates that actually showed losses to Florafax in the second and third years of the Florafax/GTE contract. These estimates were based on the view that the fees paid to GTE by Florafax would have been subject to sharp increases because of provisions in the contract that might have resulted in either fee increases or reductions depending on whether anticipated talk times for taking telephone orders and/or fulfilling the orders taken varied by a certain percentage from the times anticipated for these services, the anticipated times being specified in the contract. At trial the parties disputed whether the anticipated talk times were actually exceeded so that a fee increase would actually have been appropriate.

coverable they must be limited to a sixty (60) day period, because profits beyond this time must be deemed too remote, speculative or uncertain, and Florafax could not be said to be reasonably assured of any profits from its relationship with Bellerose for any longer period, given the Florafax/Bellerose contract clause allowing either Florafax or Bellerose the right to terminate that contract upon sixty (60) days notice. In our view, each argument is without merit.

### III(A). COLLATERAL CONTRACTS AND LOST PROFITS.

GTE asserts Oklahoma jurisprudence has not squarely addressed the question of whether a party suing for breach of contract may recover lost profits arising from a collateral contract. Although this Court may not have used the exact phrase "lost profits from third-party collateral contracts" a review of Oklahoma law makes clear if such damages are properly proved they are recoverable. Thus, GTE's apparent view that lost profits from a collateral contract are never recoverable for breach of contract because as a matter of law they are inherently too remote, speculative and/or unforeseeable, is mistaken.

The time-honored general rules on recovery of damages for breach of contract are found in *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854)—rules this Court has generally followed. *Coker v. Southwestern Bell Tel. Co.*, 580 P.2d 151, 153 (Okla. 1978). They are: 1) where no special circumstances distinguish the contract involved from the great mass of contracts of the same kind, the damages recoverable are those as would naturally and generally result from the breach according to the usual course of things, and 2) where there are special circumstances in the contract, damages which result in consequence of the special circumstances are recoverable, if, and only if, the special circumstances were communicated to or known by both parties to the contract at the time they entered the contract. 22 AM. JUR.2d *Damages* § 464 (1988). The lost profits involved here fall under the second branch of the *Hadley v. Baxendale* formulation.

Generally speaking, this Court has long espoused the view that loss of future or anticipated profit—i.e. loss of expected monetary gain—is recoverable in a breach of contract action: 1) if the loss is within the contemplation of the parties at the time the contract was made, 2) if the loss flows directly or proximately from the breach—i.e. if the loss can be said to have been caused by the breach—and 3) if the loss is capable of reasonably accurate measurement or estimate. *Groendyke Transport, Inc. v. Merchant*, 380 P.2d 682 *Second Syllabus* (Okla.1962). An award in the form of a loss of profits, in fact, is generally considered a common measure of damages for breach of contract, it frequently represents fulfillment of the non-breaching party's expectation interest, and it often closely approximates the goal of placing the innocent party in the same position as if the contract had been fully performed. H. HUNTER, MODERN LAW OF CONTRACTS, Breach & Remedies, ¶ 7.02[2] at 7–5/7–6 (1986).

Our cases also recognize that where there is sufficient evidence presented on the issue of the recovery of special damages—including lost profits—what was or was not in the contemplation of the parties at the time of contracting is a question of fact to be determined by the trier of fact. *Home–Stake Production Company v. Minnis*, 443 P.2d 91, 103 (Okla.1968). Liability for lost profits arises where the loss of anticipated profits upon breach can reasonably be said to be in the contemplation of the parties at the time of contracting. *Quincy Johnston, Inc. v. Wilson*, 358 P.2d 205, 208 (Okla.1959).

The above rules were applied in the early case of *Ft. Smith & Western Railroad Co. v. Williams*, 30 Okla. 726, 121 P. 275 (1912), a case we deem to have clearly allowed recovery of lost profits that would have been gained by virtue of a collateral contract that had been entered into prior to the contract being sued upon. *Williams* involved a situation where an individual had purchased a right from a picnic committee located at Madill, Oklahoma to operate his merry-go-round during a two day picnic to be held at Madill. After contracting with the picnic committee, the merry-go-round owner contracted with

defendant railroad to ship the machine to the picnic. Because of delay by defendant it was not delivered to the picnic until the evening of the picnic's first day. Setting it up took until the morning of the picnic's second day. Plaintiff owner sued the railroad for the lost profits he claimed he would have made in selling rides during the first day of the picnic and the part of the second day that the merry-go-round was not operational prior to its set up.

 This Court in *Williams* affirmed a jury verdict for lost profits where the evidence showed defendant had specifically been put on notice by plaintiff that the machine had to be delivered by a certain day so that it could be operational for use on the picnic's first day, had been informed of the use to which the merry-go-round would be put, had notice of the damage that would be suffered by plaintiff if it was not delivered in a timely manner and where there was evidence to support a reasonable estimate of the profits lost—evidence which included what plaintiff actually made during part of the picnic's second day. *Id.* 121 P. at 277–278. In other words, **lost profit damages were allowed that would have been earned on the basis of the collateral contract** the owner had previously entered with the picnic committee whereby he obtained the right to sell rides on the merry-go-round during the picnic. Thus, recovery for the loss of anticipated profits from collateral contracts are not *per se* off-limits in a breach of contract action. Instead, lost profits growing out of an existing collateral or subordinate agreement may be recovered where the possibility of profits was within the contemplation of the defaulting party when the main contract was made and such profits are proved with reasonable certainty. 22 AM.JUR.2d *Damages* § 469 (1988); H. HUNTER, MODERN LAW OF CONTRACTS, Breach & Remedies, ¶ 7.03[4][e]–[f] at 7–23/7–25 (1986).

 Here, there is clearly sufficient competent evidence to show GTE had within its contemplation at the time of contracting the potential for profits from a Florafax association with Bellerose. As we noted in section II. FACTS above, GTE knew it would be providing services not only directly for Flora-fax, but for others on behalf of Florafax. It knew Florafax was soliciting other entities to use the services of a call answering center like GTE's and, in fact, GTE looked upon Florafax's solicitation of these other entities as a positive aspect of a contractual relationship with Florafax because of the potential for increased revenue.

Trial evidence also showed the Florafax/Bellerose contract was entered two weeks prior to the Florafax/GTE agreement and that GTE officials knew either before or contemporaneously with signing the latter contract that Bellerose was considering turning over a portion of its inbound and outbound business via its 1–800–FLOWERS network to Florafax—business GTE also knew consisted of 100,000–200,000 orders annually. Further, as already noted, a clause in the Florafax/GTE contract itself expressly reflects the parties' contemplation of the recovery of lost profits by Florafax should GTE cease to perform its duties and obligations during the term of the contract—and, as also noted, evidence exists in this record that GTE intentionally failed to perform during part of the term of the contract, a failure on its part we conclude would support a determination the lost profit clause of the Florafax/GTE contract was implicated.

 In our view then, contrary to the arguments of GTE, lost profits from a collateral contractual relationship may be recovered in a breach of contract action if such damages can be said to have been within the contemplation of the parties at the time of contracting. Here, there is evidence in the record—if believed by the jury—that plainly would support a finding special circumstances were communicated to or known by GTE at the time of contracting, so that a reasonable conclusion would be that the prospect of profits and, conversely, their loss upon breach, were in the contemplation of the parties at the time of contracting and would be suffered by Florafax should GTE cease to adequately perform under the Florafax/GTE agreement. Therefore, GTE's apparent positions—that profits to be derived from a collateral contract are never recoverable or, even if otherwise recoverable, they are not so here because the prospect of such

profits or damages from their loss cannot be said to have been in GTE's contemplation at the time of contracting—are without merit and provide no reason to disturb the award of lost profits by the jury.[6]

## III(B). THE SIXTY (60) DAY TERMINATION CLAUSE IN THE FLORAFAX/BELLEROSE CONTRACT DOES NOT PRECLUDE THE RECOVERY OF LOST PROFITS BEYOND THE SIXTY (60) DAY PERIOD.

GTE, in addition to arguing no lost profits are proper, alternatively asserts that if their recovery is appropriate, they must be limited to a period of sixty (60) days because of the termination notice clause of the Florafax/Bellerose contract which allowed either party to that agreement to terminate that contract, with or without cause, upon sixty (60) days written notice. For this position prime reliance is placed on *Osborn v. Commanche Cattle Industries, Inc.*, 545 P.2d 827 (Okla.Ct.Civ.App.1975), an opinion of the Oklahoma Court of Civil Appeals. Although we believe the rule of law laid down in *Osborn* is sound, the rule is not controlling here.

*Osborn* involved a situation where plaintiff had contracted with a feedlot to perform certain cleaning functions, stockpiling and disposal of manure and some other duties. The contract was for a term of three years, but contained a clause allowing either party to terminate the agreement by giving the other thirty (30) days advance notice. The feedlot was sold and the new owner, without knowing of the previous owner's contract with plaintiff, hired someone else to perform the duties plaintiff was to perform. Plaintiff, not knowing of the feedlot's sale, began to purchase equipment necessary to perform his duties under the contract. No formal notice was ever given to plaintiff by the feedlot that its contract with him was terminated. The breach in *Osborn* was a failure to give plaintiff thirty (30) days advance notice of the contract's termination. Plaintiff sued the previous owner to recover the profits he would have made over the three year life of the contract, plus certain other damages. The trial court allowed the lost profit issue to go to the jury with instructions allowing their recovery for the entire three year period, over defendant's objection only nominal damages were appropriate because either party to the contract had the right to terminate it upon thirty (30) days notice.

The *Osborn* court found error in submitting the lost profit issue to the jury for a longer period than the thirty (30) day notice time frame based on the following rule of law: no party to a contract may recover more in damages for a breach of the contract

---

**6.** In a somewhat cursory fashion GTE in its appellate submissions seems to challenge certain of the jury instructions given by the trial court as to lost profits and the failure of the trial court to give a GTE requested instruction it says would have required a finding that lost profit damages from the Florafax/Bellerose contract were within GTE's contemplation at the time of contracting. To the extent GTE is challenging the instructions of the trial court in this appeal, any such challenge must be deemed unavailing. This is so because, although the transcript of the trial contained in the appellate record contains a recitation of a conference of the parties' attorneys with the trial court where instructions were discussed and objections to instructions proposed to be given by the trial court occurred (the instruction conference), neither the trial transcript or the Original Record submitted in this appeal contains any of the trial court's instructions actually given to the jury or any instructions requested by the parties. On this state of the record the following applies:

It is a well-settled rule of practice that, in order to reverse a judgment of a court of general jurisdiction, error must be made to affirmatively appear by the complaining party. The appellate court will presume that the trial court has done everything proper and necessary to have been done to support its judgment, unless the contrary affirmatively appears. And where the cause was tried to a jury, and the instructions are omitted from the [appellate] record, the appellate court will presume that the trial judge gave to the jury such instructions as were applicable to the issues and the evidence; and, if there is any state of facts deducible from the evidence applicable to the issues, which, under any theory of the law, will sustain the verdict and judgment, such judgment will not be disturbed.

*McFadyen v. Masters*, 11 Okla. 16, 66 P. 284, 285 (1901). Under this principle of appellate practice we must presume the trial court gave proper instructions to the jury as were applicable to the issues and evidence. Thus, to the extent GTE is attacking any issue concerning jury instructions its challenge must be deemed flawed and unreviewable.

than might have been gained by full performance. *Osborn, supra,* 545 P.2d at 831. Such rule of law is essentially codified at 23 O.S.1991, § 96, which provides, with certain exceptions not applicable here, "no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides. . . ." The rule applied in *Osborn* because full or complete performance under the contract could have been supplied by defendant simply giving the agreed-to notice and, therefore, plaintiff's expectation interest could have been no greater than the prospect of profit over the length of the notice period. *Osborn, supra,* 545 P.2d at 831. In that plaintiff was never assured of performance by the breaching party beyond the length of the notice period his prospect of net gain, likewise, could never extend beyond this period of time. *Id.* Plaintiff could not recover more than thirty (30) days lost profits because he could not recover more in profits than he might have made from full performance. In other words, in *Osborn* it was absolutely certain plaintiff could not establish lost profits for any greater period of time because the defendant had an absolute right to terminate the contract upon giving the agreed notice and exercise of this right would have provided full performance on the defendant's part.

The situation here is quite different. First off, we must note that Florafax does not rely on any violation of the sixty (60) day notice provision by Bellerose to support its lost profit claim. It contends, instead, that it was the breach of GTE that caused Bellerose to terminate its relationship with Florafax when it did and its relationship with Bellerose would have continued as a long-term rela-

tionship generating profits to Florafax well into the future, had it not been for GTE's breach.

Secondly, GTE had no right to terminate either the Florafax/GTE or Florafax/Bellerose contracts upon any short specified notice provision. That right belonged only to Florafax and Bellerose, and only in relation to the latter contract. Thus, full performance could not have been supplied by the simple expediency of GTE giving sixty (60) days notice to Florafax that it was terminating their agreement. Instead, the Florafax/GTE contract, according to the unchallenged finding of the jury, had a minimum term of two years based on the effect of the price renegotiation provisions of the contract, i.e. Florafax was guaranteed performance by GTE for a full two years.

Thus, the rule of *Osborn* that a non-breaching party may not receive more in damages than he might or could have gained from full performance is inapplicable because this record contains competent evidence Florafax could have made profits from the Florafax/Bellerose contract for a period longer than the sixty (60) day notice period had GTE fully performed under the Florafax/GTE contract. In fact, competent evidence exists supporting the view it is probable some additional profits would have been made from the Bellerose relationship for a longer period of time. Further, application of the *Osborn* rule here would improperly allow GTE to benefit from a cancellation right it had no ability to exercise. Accordingly, the rule of *Osborn* does not preclude Florafax's recovery of lost profit damages associated with the loss of the Bellerose relationship in excess of a sixty (60) day period.[7]

7. We also note that GTE claims reversible error by the trial court's permitting the jury to consider potential lost profits from the Florafax/Bellerose contract for a period of eight years based on evidence allowed to be submitted to the jury through Florafax's expert of his estimation of what the profits would have been over such an extended period of time. Assuming it was error to allow evidence of an estimate of lost profits over such a lengthy period of time, or to allow consideration by the jury of such an estimate, such was harmless error in view of the jury's determination to limit any lost profits to a two year period. A cause should not be reversed

because of the admission of incompetent evidence unless it affirmatively appears the admission of the evidence resulted prejudicially to the interest of the party seeking reversal. *Deatherage v. Phipps,* 441 P.2d 1020, 1022 (Okla.1967); *Richardson v. Lawler,* 204 Okla. 484, 231 P.2d 671, 674 (1951); *See also Jones v. Hudson,* 98 Okla. 116, 224 P. 185, 186 (1924) (giving of unwarranted instructions to jury on question of exemplary damages will not warrant reversal where jury verdict is returned only for actual damages). The above cases are consistent with 12 O.S.1991, § 78 and 20 O.S.1991, § 3001.1, our harmless error statutes.

### III(C). COMPETENT EVIDENCE EXISTS TO SUPPORT THE AWARD OF LOST PROFIT DAMAGES TO A REASONABLE CERTAINTY.

██ Even though the rule of *Osborn* is inapplicable, GTE's arguments as to the termination notice clause of the collateral contract do, however, implicate the legal principle that before lost profit damages are recoverable it must be adequately shown such profits were reasonably certain to have been made by the non-breaching party absent breach. We believe the answer to the reasonable certainty question is not one subject to decision as a matter of law under this record, but was one of fact to be decided by the trier of fact—here the jury.

██ In order for damages to be recoverable for breach of contract they must be clearly ascertainable, in both their nature and origin, and it must be made to appear they are the natural and proximate consequence of the breach and not speculative and contingent. *Chorn v. Williams*, 186 Okla. 646, 99 P.2d 1036, 1037 (1940). It is not necessary, however, for the recovery of lost profits shown to have been caused by a breach of contract, that the profits be established with absolute certainty and barring any possibility of failure, but it is only required that it be established with reasonable certainty that profits would have been made had the contract not been breached. *Megert v. Bauman*, 206 Okla. 651, 246 P.2d 355, 358 (1952). In essence, what a plaintiff must show for the recovery of lost profits is sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were actually suffered. *Cook Associates, Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah.1983); *See also Camino Real Mobile Home Park Partnership v. Wolfe*, 119 N.M. 436, 891 P.2d 1190, 1200–1201 (1995) (fact of lost profit damage must be shown by preponderance of the evidence); *Tull v. Gundersons, Inc.*, 709 P.2d 940, 943 (Colo.1985) (same). This requirement of proof applies to the fact of lost profits, the causation of lost profits and the amount of lost profits. *Cook Associates, Inc. v. Warnick, supra*, 664 P.2d at 1165.

The above rules, at least in part, are essentially reflected in Oklahoma's statutory law found at 23 O.S.1991, § 21, which provides:

For the breach of an obligation arising from contract, the measure of damages ... is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract, which are not clearly ascertainable in both their nature and origin.

██ Once it is made to clearly appear that loss of business profits has been suffered by virtue of the breach, it is proper to let the jury decide what the loss is from the best evidence the nature of the case admits. *Firestone Tire & Rubber Co. v. Sheets*, 178 Okla. 191, 62 P.2d 91, 93 (1936). When a breach of a contractual obligation with resulting damages has been established, although the amount of damages may not be based on mere speculation, conjecture and surmise alone, the mere uncertainty as to the exact amount of damages will not preclude the right of recovery. *Larrance Tank Corporation v. Burrough*, 476 P.2d 346, 350 (Okla. 1970). It is sufficient if the evidence shows the extent of damage by just and reasonable inference. *Id.* We believe sufficient evidence was presented so that Florafax carried its burden to prove the fact, cause and amount of its lost profit damages with the requisite degree of reasonable certainty.

The fact of lost profit damage beyond merely a sixty (60) day period is shown by the testimony of Bellerose's President. Although not absolute, his testimony was, in essence, he considered the relationship with Florafax a long-term one had things worked out and that the most important issues to him in making the decision to terminate were issues concerning performance. This testimony showed the relationship in all probability would have continued long after it was terminated had GTE adequately performed. Although it is true—given the existence of the sixty (60) day notice provision—Bellerose might have terminated the Florafax/Bellerose contract at some point in time even had GTE performed, the state of this record does

not require a conclusion Bellerose would have exercised its right of termination for some other reason.

We are also of the view the fact of damage is partially shown by the projections for profits of both the damage experts presented by the parties. Although they differed in their ultimate conclusions as to the extent or amount of lost profits, both presented estimates that Florafax could have made profits from the Florafax/Bellerose relationship had it survived.

■ Causation is also shown by sufficient competent evidence, evidence that partially overlaps with that of the fact of damage in this case. There is enough evidence to support a reasonable determination that Bellerose's decision to cancel or terminate its relationship with Florafax was the direct result of GTE's failure to render adequate performance and, that GTE's breach of the Florafax/GTE contract caused the cancellation. Therefore, there is sufficient evidence in this record upon which reasonable minds might rely that profits from the Florafax/Bellerose relationship would have actually been made by Florafax beyond a sixty (60) day period and that GTE's breach of its contract with Florafax caused the loss of Bellerose as a client.

■ As to the exact extent or amount of damages, the record contains sufficient evidence to take the matter out of the realm of mere speculation, conjecture or surmise. A track record existed which showed the calls coming to GTE from Bellerose during the five to seven months Bellerose business was actually being routed to GTE. There was also evidence that although the business relationship between Florafax and Bellerose was relatively new, Bellerose had been in business for a number of years, and it had experienced 100,000–200,000 orders annually. Such evidence clearly was appropriate to consider on the issue of the extent of lost profits. Although this case is not exactly like our cases dealing with the destruction of an established business by a breach of contract, it is sufficiently close to be analogized to the established business situation, where we have allowed the recovery of lost profits. *See e.g. Firestone Tire & Rubber Co. v. Sheets, su-*

*pra,* 62 P.2d at 93; *See also Hardesty v. Andro Corporation–Webster Division,* 555 P.2d 1030, 1034–1035 (Okla.1976), *disapproved on other grounds Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc.,* 604 P.2d 849 (Okla.1979); and *City of Collinsville v. Brickey,* 115 Okla. 264, 242 P. 249, 249–250 *Fifth Syllabus* (1925) (tort case where nuisance resulted in destruction of established business).

■ Evidence also existed which showed that Bellerose, after terminating its relationship with Florafax, experienced a substantial increase in its sales volume in 1991. In other words, there was not only evidence tending to show a certain volume of orders prior to the breach, but evidence tending to show that level of sales would have in all probability increased substantially during part of the term of the Florafax/GTE contract had Bellerose continued its relationship with Florafax. This post-breach evidence is proper to be considered at arriving at a reasonable estimate of the loss caused by a breach of contract [*Ft. Smith & Western Railroad Co. v. Williams, supra,* 121 P. at 278] because all facts which would reasonably tend to make certain the amount of injury inflicted are admissible. *Cloe v. Rogers,* 31 Okla. 255, 121 P. 201, 208 (1912). Although the jury apparently did not totally credit the testimony or documentation presented by either Florafax's or GTE's experts as to their projections of profits lost, the $750,000.00 awarded for the two year period was within the range of the estimates of the two experts. Accordingly, not only was the fact and causation of lost profit damages adequately shown to a reasonable certainty, but the amount of lost profit damages awarded was sufficiently shown through competent evidence contained in this record to take the matter out of the realm of mere speculation, conjecture and surmise.

## IV. CONCLUSION.

The award of the jury of lost profit damages associated with the Florafax/Bellerose contract was an appropriate remedy for GTE's breach of its contract with Florafax. It was consistent with our substantive law as

to the recovery of lost profits for a breach of contract and was supported by competent evidence.

Accordingly, our PREVIOUS GRANT OF CERTIORARI IS LIMITED TO LOST PROFIT ISSUES RAISED ON CERTIORARI; CERTIORARI IS WITHDRAWN AS IMPROVIDENTLY GRANTED ON ALL OTHER ISSUES AND DENIED ON SAID ISSUES; the COURT OF CIVIL APPEALS' OPINION IS VACATED AS TO ITS DISPOSITION OF THE LOST PROFIT AWARD AND IS WITHDRAWN FROM PUBLICATION; and the TRIAL COURT JUDGMENT IS AFFIRMED AS TO THE AWARD OF LOST PROFITS.

KAUGER, C.J., SUMMERS, V.C.J., and WILSON and WATT, JJ., concur.

HODGES, SIMMS and HARGRAVE, JJ., dissent.