Janell STANDIFER, Appellant,

v.

VAL GENE MANAGEMENT SERVICES, INC., a corporation, Appellee.

No. 46519.

Court of Appeals of Oklahoma, Division No. 2.

Aug. 13, 1974.

Released for Publication by Order of the Court of Appeals Sept. 5, 1974.

Philip Holmes, Inc., Oklahoma City, for appellant.

James E. Work, Shirk, Semtner, Work, Robinson & Bennett, Oklahoma City, for appellee.

BRIGHTMIRE, Presiding Judge.

This is a slander action. The trial court disposed of it by granting defendant a summary judgment. Whether he was correct in doing so is the only issue presented for review. We think he was and affirm.

In her petition, plaintiff stated that through the mouth of its agent, 24-year-old redheaded Sharon Gayle Wright, defendant corporation maliciously spoke and published to several people certain slanderous, false and defamatory words about plaintiff, "to-wit: That the plaintiff was a constant troublemaker; that the plaintiff was not a fit tenant; that the plaintiff was harassing her; that the plaintiff had 'cussed her out'; that the plaintiff was disruptive in nature and was bothering the other tenants; and various and numerous statements tending to degrade the plaintiff . . . and . . . spoken . . . to blacken and injure the honesty, virtue, integrity, morality and reputation of . . . plaintiff and to thereby expose

her to public contempt and ridicule." As a "direct . . . result" of all this she "was compelled to move from her residence of many years and incurred [these] actual damages . . . Moving expense—$375.00; Telephone—$15.00; Automobile expense—$20.00; and additional rent—$80.00." She asked for these amounts plus $5,000 general damages and $25,000 punitive damages.

A demurrer challenging the sufficiency of the petition was overruled. Defendant's short answer did nothing more than deny the allegations regarding slander.

Following the taking of agent Wright's deposition and plaintiff's, defendant filed an amended answer adding that if the alleged statements were made, they "are true."

A pretrial conference was held a short time later. And then defendant filed a motion for summary judgment stating in substance that plaintiff's deposition testimony generally supported the factual allegations in her petition and "assuming that all the statements said to have been made by defendant were in fact made, they are insufficient as a matter of law to be the foundation for recovery."

A short time later the court agreed and in sustaining the motion said:

"The remarks under consideration, although undeniably vulgar and offensive, do not fall within any of the various categories of publications recognized by the Oklahoma statute to be slanderous *per se* . . . Yet, it seems clear beyond argument that the complained of remarks, under the circumstances established by the complaints' allegations, can only be deemed as words of abuse calculated to 'annoy and irk,' and, were not such as imputed to the plaintiffs' general disqualification touching peculiar abilities needed to follow their occupations."

The first question to be resolved is whether under District Court Rule 13, 12 O.S.1971, Ch. 2, App., the pleadings and depositions on file in this case require a

finding that no substantial controversy as to any material fact exists and if not whether under the admitted facts defendant is entitled to judgment as a matter of law.

This question involves consideration of one or two more basic issues: (1) is the alleged publication slanderous per se; or if not, (2) has special resulting damage been adequately alleged?

To start our probe of these points we quote the statute defining slander—12 O. S.1971 § 1442:

"Slander is a false and unprivileged publication, other than libel, which:

"1. Charges any person with crime, or with having been indicted, convicted or punished for crime.

"2. Imputes in him the present existence of an infectious, contagious or loathsome disease.

"3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profit.

"4. Imputes to him impotence or want of chastity; or,

"5. Which, by natural consequences, causes actual damage."

We can dismiss from consideration those paragraphs numbered one through four as being irrelevant because not alleged by plaintiff.

Slander is one of the two torts comprising the law of defamation. In general it is an oral publication while its mate, libel, is generally a written one. The distinction between the two developed haphazardly in old English courts from as far back as Runnymede. Their decisional expendiencies were influenced considerably by the rise and fall in popularity of the actions at various points in time and—during the 14th and 15th centuries—by the ecclesiastical courts' punishment of defamation as a "sin." A jurisdictional dispute between church and common law courts was temporarily resolved by allowing the latter tribunals to act if "temporal" damage could be proved and if not then the defamation was deemed a "spiritual" matter for the church to handle. In its early development slander was thought to be within the province of ecclesiastical law prompting secular courts to hold the action would not lie without proof of "temporal" damages. Eventually proof of actual damage became an essential element of slander. Then in deference to reality courts began to recognize various exceptions such as imputations of a crime, of a loathsome disease, and those adversely affecting plaintiff's trade, business, or profession—exceptions which required no proof of damages.[1] This historical distinction between libel and slander eventually found its way into the statutory law of this area while Oklahoma was still Indian Territory,[2] along with—as can be seen above—the addition of a fourth category regarding imputation of unchastity or impotency to one.

To compare our libel statute with the one defining slander is to dramatize the distinction and underscore the former's much larger "temporal" base. It is 12 O. S.1971 § 1441 and reads:

"Libel is a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, *which exposes any person to public hatred*, contempt, ridicule or obloquy, *or which tends to deprive him of public confidence, or to injure him in his occupation*, or any malicious publication as aforesaid, designed

1. Holdsworth, Defamation in the Sixteenth and Seventeenth Centuries, 40 L.Q.Rev. 302, 397 (1924), 41 L.Q.Rev. 13 (1925) ; Carr, The English Law of Defamation, 18 L.Q. Rev. 255, 388 (1902) ; The English Law

Veeder, History and Theory of the Law of Defamation, 3 Col.L.Rev. 546 (1903), 4 Col.L.Rev. 33 (1904).

2. St.1890 §§ 2157, 3986.

to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives or friends." (emphasis ours)

At once it can be seen libel has quite a bit broader statutory definition than slander. That the historical basis for the difference is irrational is beside the point. The statute being what it is must determine human rights until otherwise legally changed.

■ Turning now to the case at bar, it is conceded that plaintiff has not attempted to plead or complain of any statement which would be actionable slander without proof of damages under the first four numbered paragraphs of § 1442. These are the only "per se" slanders actionable in this state. All others are "per quod." Thus if an action she has it must be in terms of paragraph five requiring pleading and proof of "actual damage."

The words said to have been spoken by defendant's agent were, we think, defamatory on their face in that they have a clear tendency to injure plaintiff's reputation. By natural import they diminish the esteem, respect, and confidence in which she is held by others. They would, had the publication been written, be actionable without proof of damages.

■ But it was not written and so—because they neither charge a crime, impute disease or sexual irregularity, nor tend to injure plaintiff in respect to any known office or calling—it matters not how grossly defamatory or insulting the words may be they are actionable only upon proof of "special damage." Barry v. Baugh, 111 Ga.App. 813, 143 S.E.2d 489, 23 A.L.R.3d 645 (1965).

■ The next question then is does plaintiff claim actual damages which the slander "by natural consequences" caused?

The phrase "by natural consequences" is another way of saying there must be a causal connection between the slanderous statement and the damage sought—one that is reasonably direct.

As mentioned earlier the special damages plaintiff says she sustained as a "direct result" of the defamation were various items relating to moving from defendant's apartment to another.

The only conceivable basis upon which the moving expenses could be the natural consequences of the alleged slander would be that the defamation published to plaintiff's fellow tenants caused them to react toward and treat her in such a manner as to significantly interfere with the enjoyment of her habitation and effectuate a constructive ouster therefrom.

Such causal connection is not perceptible on the face of plaintiff's petition. And since this would not necessarily foreclose proof of the consequence at trial we will examine the record to see if it discloses any admission by plaintiff fatally inconsistent with a cause and effect relationship between the slander and the move.

In her deposition plaintiff testified she had been a tenant at defendant's "Canadian Manor Apartments" for about two years. On about September 1, 1971, agent Wright became manager of the complex. The two were on friendly terms at the beginning and occasionally had coffee together. On September 15, 1971, plaintiff says she signed a "month to month" lease agreement in which the owner, among other things, reserved "the right to require the resident of the above named apartment to vacate the property at any time and for any reason . . . [on] thirty (30) days advance notice in writing . . . ."

As to when she first became aware that a problem existed between her and the new manager plaintiff said: "I don't know. She had coffee with me when [they] first moved in, morning after morning . . . after she was manager."

"I met her the day that she was manager," continued plaintiff, "I helped her in the flower beds, helped clean up around the place."

Regarding the defamation plaintiff said, "I had no knowledge that anything of this sort was going on."

"Well," she was asked, "what was the first indication that you had that there was any problem between you and Mrs. Wright?"

"On October 28th"

"Of what year?"

" '71. Mr. and Mrs. Wright came to my door on Friday morning, and told me that I'd have to be out by Monday . . . . I asked them if they were kidding; for what reason . . . . He didn't give me a reason," said plaintiff.

So plaintiff moved.

Interpreting the foregoing in a light most favorable to plaintiff we can see no way the alleged defamation could have caused the move for the simple reason plaintiff was unaware of it until after she vacated defendant's apartment where she presumably would still be had she not been asked to move. The cause of the move was a request by the manager to do so—a request involving neither a tortious nor anti-contractual act—not the defamation. Injured reputation there may have been but unless it in some way precipitated the change of apartments the latter could not be a natural consequence of the former.

We therefore hold the facts admitted by plaintiff disclose she is without an actionable cause for lack of special damages hence the trial court did not err in awarding defendant a summary judgment.

Affirmed.

BACON and NEPTUNE, JJ., concur.