2002 OK CIV APP 115

**H.L. MITCHELL, Plaintiff/Appellee,**

v.

**GRIFFIN TELEVISION, L.L.C., an Oklahoma corporation, and Chris Halsne, an individual, Defendants/Appellants.**

**No. 96,640.**

Court of Civil Appeals of Oklahoma,
Division No. 3.

Sept. 6, 2002.

Certiorari Denied Nov. 25, 2002.

Douglas E. Stall, David Von Hartitzsch, Latham, Stall, Wagner, Steele, & Lehman, Tulsa, OK, Clyde A. Muchmore, Mary Hirth Tolbert, Crowe & Dunlevy, Oklahoma City, OK, for Plaintiff/Appellee.

Robert D. Nelon, Jon Epstein, Susanna G. Voegeli, Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK, for Defendants/Appellants.

Opinion by CAROL M. HANSEN, Presiding Judge:

¶1 Defendant/Appellants, Griffin Television, L.L.C. (Griffin) and Chris Halsne (collectively KWTV), seek review of the trial court's judgment based on a jury verdict in favor of Plaintiff/Appellee, H.L. Mitchell. We affirm as to the finding of liability and award of punitive damages, reverse as to compensatory damages, and remand for new trial as to compensatory damages.

¶2 Mitchell is a veterinarian in Bristow, Oklahoma. Between January 27, 1998, and September 13, 1998, KWTV broadcast seven stories dealing with Mitchell's treatment of a halter horse named This Lady Sings at the 1997 World Quarter Horse Championships in Oklahoma City and the death of a quarter horse named Doo Dominate at the All American Futurity in New Mexico on September 5, 1994. Mitchell sued KWTV for defamation and false light invasion of privacy arising from the stories.

¶3 A jury trial took place in June 2001. At the close of evidence, KWTV moved for a directed verdict. The trial court denied the motion and submitted the case to the jury. The jury specially found Griffin and Halsne acted in reckless disregard of the truth of the statements published and intentionally and with malice concerning Mitchell. It awarded $6,000,000.00 in actual damages against Griffin and Halsne, $250,000.000 in punitive damages against Griffin, and $250,000.00 in punitive damages against Halsne. The trial court granted judgment for the verdict amount, as well as $1,323,950.00 in prejudgment interest and $5,010.02 in costs, for a total judgment

amount of $7,828,960.02. KWTV appeals from that judgment.

I

¶ 4 One group of KWTV's contentions raises the issue of whether there was sufficient evidence for the jury to hold KWTV liable to Mitchell. KWTV argues the trial court should have directed a verdict in its favor because Mitchell (1) failed to present evidence from which a jury could reasonably conclude any of the statements about which he complained is substantially false, (2) presented no evidence of special damages to support a defamation *per quod* claim, (3) failed to submit expert testimony that KWTV departed from the standard of care to which reasonable journalists ordinarily adhere under similar circumstances, (4) failed to present clear and convincing evidence of actual malice, and (5) put on no evidence any harm to his reputation was caused by false statements rather than true ones. Because the last contention relates to damages, we will address it in Part II below.

■■■ ¶ 5 In order to recover for defamation, a private figure must prove (1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication. *Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, 987 P.2d 1218, 1223. If the publication is a fair and true report of a proceeding authorized by law or anything said in the proceeding, it is privileged. 12 O.S.1991 § 1443.1(A). Negligence is the failure to exercise ordinary care, which is "that degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under

similar circumstances." *Martin v. Griffin Television, Inc.*, 1976 OK 13, 549 P.2d 85, 92. Slander is actionable *per se*, without a showing of actual damage, if it falls within the first four sections of 12 O.S.1991 § 1442.[1] *Standifer v. Val Gene Management Services, Inc.*, 1974 OK CIV APP 41, 527 P.2d 28, 31.

■■■ ¶ 6 While negligence is the minimum level of fault necessary for a private figure to recover for slander, the plaintiff may expand the relief available by showing greater culpability on the defendant's part. Upon a showing of actual malice, the plaintiff may recover punitive damages, and, where otherwise allowed, presumed damages.[2] *Martin v. Griffin Television, Inc.*, 1976 OK 13, 549 P.2d 85, 93. "Actual malice" means "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Proof of malice obviates the need to prove negligence.

■■■ ¶ 7 In order to recover for false light invasion of privacy, the plaintiff must show (1) the defendant gave publicity to a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. *McCormack v. Oklahoma Pub. Co.*, 1980 OK 98, 613 P.2d 737, 740.

■■■ ¶ 8 In reviewing a judgment based on a jury verdict, we may not disturb the jury's verdict where there is any competent evidence reasonably tending to support it. The jury is the exclusive arbiter of the credi-

---

1. 12 O.S.1991 § 1442 provides,
 Slander is a false and unprivileged publication, other than libel, which:
 1. Charges any person with crime, or with having been indicted, convicted or punished for crime.
 2. Imputes in him the present existence of an infectious, contagious or loathsome disease.
 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occu-

pation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profit.
 4. Imputes to him impotence or want of chastity; or,
 5. Which, by natural consequences, causes actual damage.

2. See Part II below for a discussion of presumed damages.

bility of the witnesses, and its verdict is conclusive as to all disputed facts and all conflicting statements. We must determine the sufficiency of the evidence to sustain a judgment in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it. *Florafax Intern., Inc. v. GTE Market Resources, Inc.,* 1997 OK 7, 933 P.2d 282, 287. As to the element of malice, the evidence must be sufficient for a trier of fact to find or infer its existence subject to a clear and convincing standard of proof. *Herbert v. Oklahoma Christian Coalition,* 1999 OK 90, 992 P.2d 322, 328. This standard applies to both public officials and private figures. *Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, 958 P.2d 128, 141 n. 46. However, it does not apply to any element other than malice.

¶ 9 The news stories of which Mitchell complains began with reports relating to This Lady Sings. Mitchell testified he examined the horse soon after she was unloaded at the fairgrounds before the horse show. He said she was "a little tender on her right front foot" and had twisted her shoe. He testified he told the trainer the horse needed a farrier. Mitchell said the trainer was unable to find a farrier that evening and was worried the horse would "fret all night and gan up and lose weight and quit drinking." Mitchell said he wrapped her foot, but could see she was not very comfortable on it, so he "did a Sarapin posterior digital heel block on her" with "three-quarters of a cc" of Sarapin, which was "a minute amount." He said Sarapin is called a natural block in holistic circles and wears off in 24 to 36 hours. Mitchell testified This Lady Sings was not hobbling when he saw her.

¶ 10 This Lady Sings was sold after the show. On January 21, 1998, her purchaser sued the sellers and trainer in federal district court for rescission of the contract and damages for breach of warranty and fraud in the inducement of the contract. The complaint alleged as follows:

12. That on November 15, 1997, Skoda [the purchaser] had the mare inspected by Dr. Mitchell, a veterinarian on the grounds of the show, who conducted a prepurchase exam of the horse and represented to Skoda, and his insurer, that the horse was sound.

. . .

16. That the mare was then presented to the previous examining veterinarian, which [sic] found some bruising on the hoof wall, apparently related to improper shoeing and that silicone had been placed under the pad of the mare's left hoof; the silicone pads prevented a clear view of the sole at the time of the original purchase examination.

. . .

19. That Skoda conducted a further investigation into the unsoundness of the mare and later on November 22, 1997, learned from Dr. Mitchell that prior to the Amateur Division Showing, he had "blocked" one of Casper's adult horses scheduled to appear in the Amateur Division showing; said block being a veterinary technique to numb pain, so that the horse will not present outward manifestation of pain, or unsound gate.

20. That Casper had only one adult horse to be presented and [sic] the said showing, to wit; "This Lady Sings".

21. That Casper knew that the mare was unsound at the time of the negotiations with Skoda and had undertaken specific overt acts to disguise the lame condition.

¶ 11 In the January 26, 1998 10:00 p.m. news broadcast, Halsne reported,

This Lady Sings was named best-amateur-in-the-world just three months ago. Now, her new trainer . . . says lameness in her front feet have [sic] ended the horse's career. . . .

There is a dark secret to this horse's injury . . . One the American Quarter Horse Association has under investigation. This Lady Sings was hobbling before the World Championships . . . and was given a pain-killer. . . .

What [Mitchell] did was put a chemical called Sarapin in her foot to mask the pain.

Prior to the next evening's broadcast, KWTV ran a promotional tape in which the announcer stated, "An Oklahoma vet linked in a

federal lawsuit to masking the injuries of a champion show horse." In the 10:00 p.m. broadcast, Halsne reported,

The federal case says Mitchell knew that This Lady Sings was hobbling before the world show. Afterwards, he examined the horse for a new buyer and didn't disclose the mare's previous injury. . . .

Dr. Mitchell claims the horse was badly shod when it came to the world championships, and he simply treated a bruise. The new buyer says the horse's health condition is chronic.

At trial, Halsne testified he was familiar with the complaint and had it in his possession prior to airing the story.

¶ 12 The complaint in the federal suit did not say Mitchell knew the horse was hobbling before the horse show. While it did accuse the trainer of acting with the purpose of disguising, or masking, the horse's lame condition, it did not allege Mitchell acted with that purpose. It alleged Mitchell told the buyer he blocked the horse. It alleged the block is a veterinary technique to numb pain, so that the horse will not appear unsound, but it did not allege Mitchell intended it for the purpose of masking the horse's unsoundness. The complaint did not accuse Mitchell of concealing the horse's condition when he did the prepurchase exam; rather it alleged the horse's condition was concealed from Mitchell by the silicone pad on the mare's left hoof.

¶ 13 Halsne's statements do not truly and fairly report the allegations in the complaint. Therefore, his publication is not privileged pursuant to 12 O.S.1991 § 1443.1(A). The complaint itself, when compared with Halsne's statements, is evidence from which the jury could find Halsne made false and defamatory statements to third parties about Mitchell and that the statements tended to injure Mitchell in his profession. Halsne's own admission he was familiar with the complaint is clear and convincing evidence from which the jury could find he made the statements with reckless disregard as to their falsity. Because Mitchell put on evidence of malice, he did not need to prove negligence. The statements were

defamatory *per se* and not *per quod;* therefore, Mitchell did not need to prove special damages in order to establish liability for slander pursuant to 12 O.S.1991 § 1442(3). This same evidence would support a finding by the jury of each of the elements of a false light invasion of privacy claim.

¶ 14 The jury's verdict is also supported by the evidence relating to the news stories about Doo Dominate. Mitchell treated Doo Dominate prior to the 1994 All American Futurity race at Ruidoso Downs racetrack in New Mexico. During the race, the horse stumbled and broke both front legs. Track veterinarians euthanized the horse, took blood and urine samples, and removed his front legs for necropsy. Two other horses broke down and were euthanized that day.

¶ 15 Wayne Conwell, the Medication Manager for the New Mexico State Racing Commission (NMSRC), investigated Doo Dominate's breakdown. He sent the samples for testing and the legs for necropsy. The necropsy report concluded,

This horse had chronic severe carpal joint disease affecting the left carpus. There were chronic and acute fractures of the radial carpal bone and the 3rd carpal bone in the left carpus.

. . .

In summary, the chronic carpal joint disease in the left carpus appeared severe enough to make this horse unfit for racing. Acute left carpal breakdown may have been responsible for the acute fracture of the cannon bone in the opposite leg.

The laboratory to which Conwell sent the urine sample reported the sample tested positive for mepivacaine, a prohibited pain-killer.[3] The horse's owner exercised his right to send a split sample to an independent laboratory. That laboratory's results failed to confirm the presence of mepivacaine.

¶ 16 The NMSRC issued a Notice of Contemplated Commission Action against Mitchell, charging him with practicing veterinary medicine in New Mexico without a license and with assisting Doo Dominate's owner

---

3. At the time of the 1994 race, mepivacaine was prohibited within 72 hours of race day. However, the NMSRC later amended its rules to allow a threshold amount of the drug.

and trainer in running an unfit horse. It did not charge him with giving the horse mepivacaine. After a hearing, the NMSRC issued an order finding Mitchell practiced veterinary medicine at Ruidoso Downs without holding a license issued by the New Mexico Board of Veterinary Examiners. It permanently revoked his owner's license.[4] However, the order specifically concluded the evidence was insufficient to prove Mitchell assisted the owner and trainer in running an unfit horse.

¶ 17 The NMSRC brought a separate action against the owner and trainer for the use of mepivacaine. It later dismissed those charges because the results of the independent laboratory did not confirm the presence of mepivacaine in Doo Dominate's urine sample.

¶ 18 Halsne said he looked at these documents before airing his report. He testified,

> We were looking for specific documents that support the allegations in front of us about Dr. Mitchell [,] about Doo Dominate.... [W]e couldn't read every word of those documents and didn't. We were looking for key pieces that would support our story and maybe shed some light on some areas that didn't support our story....
>
> ...
>
> [W]e had already done a couple of stories about Dr. Mitchell, and so when we went down we wanted to—I mean our concentration was on ties in [sic] Dr. Mitchell and the death of Doo Dominate and how close those ties were and what they were.

¶ 19 On February 4 and 5, 1998, KWTV repeatedly aired a promotional tape stating, "You'll be appalled by what racing officials say this vet has done." In the 10:00 p.m. newscast on February 5, 1998, the anchor introduced Halsne's story, stating,

> [A]n Oklahoma veterinarian is the target of a News Nine investigation tonight. Not only is he accused in a federal lawsuit of giving a world-class quarter horse painkillers before a show here, he's also suspected of killing one of the country's top racehorses.... Lead investigator, Chris

Halsne has discovered that Dr. Mitchell has a troublesome past....

¶ 20 Halsne then reported,

> [T]his incident isn't the first time Mitchell has been in trouble for his veterinary practices.
>
> Doo Dominate bolted out of Gate 9 during the 1994 All–American Futurity at Ruidoso Downs. One hundred yards from the finish, the powerful colt stumbled, broke both legs, and had to be euthanized. The New Mexico Racing Commission conducted an extensive investigation. An exam afterward showed Doo Dominate competed doped up and with a broken knee.

On March 26, 1998, the anchor introduced another story about Mitchell, stating, "A few months ago a News Nine investigation showed how Mitchell was connected to the doping of a world-class racehorse and a world champion show horse." Halsne then reported on the rescission of Mitchell's Oklahoma racing license.

 ¶ 21 This record presents sufficient evidence from which the jury could find Halsne falsely reported the NMSRC found Doo Dominate raced doped-up and Mitchell was linked to the doping. There is evidence Halsne knew the statement was false or acted with reckless disregard of whether it was false or not. A reasonable jury could find the statement injured Mitchell's professional reputation. The statement was not a true and fair report of the NMSRC proceeding and therefore is not privileged pursuant to 12 O.S.1991 § 1443.1(A).

¶ 22 Accordingly, we hold there was sufficient evidence for the jury to hold KWTV was liable to Mitchell for slander and false light invasion of privacy.

II

¶ 23 Another group of KWTV's contentions of error relate to the compensatory damages award. KWTV argues (1) the trial court erred in instructing on presumed damages, (2) Oklahoma law does not permit presumed damages in a defamation case against the media even when actual malice is shown, (3)

---

4. The owner's license permitted Mitchell access to the track as a horse owner.

presumed damages can only be nominal, (4) the compensatory damages awarded bear no rational relationship to the demonstrated harm and are so excessive as to shock the conscience, and, as noted in Part I above, (5) Mitchell put on no evidence any harm to his reputation was caused by false statements rather than true ones.

¶ 24 In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court established the rule requiring proof of actual malice in order for public officials to recover for defamation. It later extended the rule to public figures in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court considered whether to apply the *New York Times* standard to private individuals. It declined to do so, reasoning states have a greater interest in protecting private individuals than public figures from defamation because private individuals have less access to communication channels to counteract false statements and therefore are more vulnerable to injury. *Id.*, 418 U.S. at 344, 94 S.Ct. at 3009. The Court stated,

We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.

However, the Court then balanced the media's First Amendment rights against the States' legitimate interest in compensating private individuals for injury to reputation:

[T]his countervailing state interest extends no further than compensation for actual injury.... [W]e hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

418 U.S. at 349, 94 S.Ct. at 3011.[5]

¶ 25 The Oklahoma Supreme Court addressed the application of *Gertz* to then-existing Oklahoma law in *Martin v. Griffin Television, Inc.*, 1976 OK 13, 549 P.2d 85. At that time, Oklahoma statutes allowed a presumption of malice from the publication of unprivileged, defamatory matter. The Court held those statutes were unconstitutional under *Gertz* because a presumption of malice allows liability without fault. It then chose

---

5. The Court further explained its holding:

The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms....

We would not, of course, invalidate state law simply because we doubt its wisdom, but here we are attempting to reconcile state law with a competing interest grounded in the constitutional command of the First Amendment. It is therefore appropriate to require that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved. It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation.... Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship, but, unlike the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. .... In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury.

418 U.S. at 349–350, 94 S.Ct. at 3011–3012.

negligence as the appropriate standard of liability for the publisher of a defamatory falsehood injurious to a private individual in Oklahoma.

¶ 26 The Oklahoma Supreme Court also overruled as unconstitutional a statutory section requiring a minimum judgment of one hundred dollars because the statute required *no proof as to that minimum amount.* It stated, "This is a presumed damage not allowed by *Gertz* without evidence and a finding of actual malice." *Id.* at 93.

■ ¶ 27 KWTV argues the statute overruled in Martin was the only source of presumed damages in Oklahoma, and no cases following *Martin* have allowed presumed damages. As we discussed in Part I, 12 O.S.1991 § 1442 authorizes actions for slander *per se,* without a showing of actual damage, for false and unprivileged publications falling within the first four sections of the statute. Therefore, the Legislature contemplated presumed damages for slander *per se.* In light of *Gertz,* though, presumed damages are only allowed where actual malice is shown.

■ ¶ 28 However, the Legislature has set forth an exception to the allowance of presumed damages in 12 O.S.1991 § 1447.3 (emphasis added):

In any action for damages for any defamatory statement published in or uttered as a part of a television and/or radio broadcast, the complaining party shall be allowed such actual and/or punitive damages *as he has alleged and proved.*

This statute is *controlling in the instant case.* Damages must be proved, not presumed. The trial court erred in instructing the jury (1) the law presumes Mitchell suffered general damages if he showed KWTV acted with malice, and (2) it may award presumed, general damages without proof of harm. Therefore, the trial court's judgment for compensatory damages is reversed and this matter must be remanded for new trial as to the issue of compensatory damages only.[6] On remand, Mitchell must prove his damages proximately resulted from the defamatory statements, but he is not limited to his out-

of-pocket loss. He may recover for loss of profits as well as impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering, subject to proof. *Martin v. Griffin Television, Inc.,* 549 P.2d at 93.

¶ 29 Because we reverse the trial court's judgment as to compensatory damages, we need not reach KWTV's contentions that presumed damages can only be nominal and the verdict was excessive.

## III

¶ 30 KWTV next contends the trial court erred as a matter of law in failing to determine certain statements were not actionable. It argues one group of statements were not actionable because *they were not about* Mitchell or were not defamatory. In its reply brief, KWTV argues the broadcasts should be viewed as a whole, with the statements considered in context. The gist of the broadcasts as a whole is that Mitchell doped horses to conceal their injuries. The statements in the context of the broadcasts are about Mitchell and are defamatory.

¶ 31 KWTV argues another group of statements were privileged pursuant to 12 O.S. 1991 § 1443.1. As we discussed in Part I, KWTV's statements did not truly and fairly report legal proceedings. Therefore, its statements are not privileged.

■ ¶ 32 KWTV argues two of the statements were protected opinion. These statements were that the death of one horse was connected to the doping of the other horse and that Mitchell was connected to the doping of both horses. The questions of whether the horses were doped and whether Mitchell was connected to their doping are sufficiently factual to be susceptible of being proved true or false. See *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990). Therefore, the statements are not protected opinion.

6. A new trial may be granted on the issue of damages only in cases where it is clear the error in assessing damages did not affect the entire

verdict. *Fields v. Volkswagen of America, Inc.,* 1976 OK 106, 555 P.2d 48, 53.

IV

¶ 33 KWTV's next group of contentions relate to jury instructions. In reviewing jury instructions on appeal, we must consider the instructions as a whole. The instructions need not be ideal but must reflect Oklahoma law regarding the subject at issue. The test for error in instructions is whether the jurors were probably misled regarding the legal standards they should apply to the evidence. We will not reverse a judgment based on error in instructing the jury unless it clearly appears the instructions given or refused caused a miscarriage of justice. *King v. Neal,* 2001 OK CIV APP 11, 19 P.3d 899, 902.

¶ 34 KWTV first argues the trial court erred in refusing to pre-instruct the jury on the elements of Mitchell's claims and on the definition of actual malice, thus allowing the jury to be "infected with prejudicial evidence and argument." Even if pre-instruction would have been helpful, the jurors received the necessary instructions before they began deliberations. We find no error in the trial court's action.

¶ 35 KWTV next argues the trial court erred in refusing to give constitutionally adequate instructions because it refused to give an instruction regarding what is not actual malice. The jury instructions defining actual malice correctly state Oklahoma law. We are unable to conclude the jurors were probably misled regarding the legal standards they should apply to the evidence.

¶ 36 KWTV also argues the trial court inadequately defined negligence and direct cause. KWTV fails to support this contention with citations of authority. Accordingly, we will treat it as waived. *Messler v. Simmons Gun Specialties, Inc.,* 1984 OK 35, 687 P.2d 121, 129 n. 11.

¶ 37 We addressed the trial court's error in instructing on presumed damages in Part II above. KWTV's next contention is the trial court erred in refusing to give special interrogatories to the jury asking which statements it found to be actionable. The Oklahoma Constitution, Art 7, § 15, requires that all jury verdicts be general verdicts. The trial court has discretion to direct special findings. *Id.* We will not reverse a trial court under abuse of discretion unless it made a clearly erroneous conclusion and judgment, against reason and evidence. *Broadwater v. Courtney,* 1991 OK 39, 809 P.2d 1310, 1312. KWTV has failed to show any abuse of discretion in the trial court's refusal to give special interrogatories.

¶ 38 KWTV's last argument regarding jury instructions is the trial court erred in instructing on Category II punitive damages because Mitchell failed to show KWTV acted with malice. As we discussed in Part I, Mitchell put on evidence from which the jury could find malice. Therefore, the trial court properly instructed the jury on Category II punitive damages pursuant to 23 O.S.Supp. 1995 § 9.1(C).[7]

¶ 39 The jury awarded punitive damages of $250,000.00 against each defendant. This award would be within the statutory limit set forth for Category II punitive damages regardless of the amount of compensatory damages awarded on remand. However, should the jury and trial court find no actual damages on remand, the punitive damages award must be vacated because § 9.1(C) requires an award of actual damages before punitive damages may be awarded. Accordingly, we do not reverse the award of punitive damages, but instruct the trial court to vacate the punitive damages award in the event there is no award of compensatory damages on remand.

7. 23 O.S.Supp.1995 § 9.1(C) provides, Category II. Where the jury finds by clear and convincing evidence that:
 1. The defendant has acted intentionally and with malice towards others;
 . . . the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in an amount not to exceed the greatest of:

 a. Five Hundred Thousand Dollars ($500,-000.00),
 b. twice the amount of actual damages awarded, or
 c. the increased financial benefit derived by the defendant or insurer as a direct result of the conduct causing the injury to the plaintiff and other persons or entities.

V

¶ 40 KWTV's last group of contentions relate to evidentiary rulings. It asserts the trial court made three errors in admitting Mitchell's evidence, but fails to show how the admission of the evidence affected a substantial right. It argues the trial court improperly excluded testimony from two of its witnesses, but fails to show how that evidence would tend to make the existence of a material fact more or less probable. Therefore, we may not predicate any reversible error upon the trial court's evidentiary rulings. 12 O.S.1991 §§ 2104(A), 2401, and 2402.

¶ 41 For the foregoing reasons, the judgment of the trial court is AFFIRMED to the extent it found KWTV liable to Mitchell for slander and false light invasion of privacy and awarded punitive damages. It is REVERSED to the extent it awarded compensatory damages. This matter is REMANDED for new trial on the issue of compensatory damages only. The trial court is instructed to vacate the punitive damages award in the event there is no award of compensatory damages on remand.

¶ 42 The motion of The Reporters Committee for Freedom of the Press and others for leave to file an amicus curiae brief in this appeal was filed after the normal briefing cycle set for the party to be supported. Because the amici have failed to show the requisite extraordinary cause for leave to file their brief, their motion is denied.

¶ 43 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

ADAMS, J. and MITCHELL, J., concur.