OSCN Found Document:IN RE GUARDIANSHIP OF L.A.C.

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 IN RE GUARDIANSHIP OF L.A.C.
2024 OK 2
Case Number: 120500
Decided: 02/06/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 2, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

IN RE GUARDIANSHIP OF L.A.C., an Incapacitated Person,

AMY MEYER, Plaintiff/Appellant,
v.
ALLISON WHITE, and W. SCOTT WHITE, Defendants/Appellees.

ON CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION III
HONORABLE JAMES W. KEELEY, TRIAL JUDGE 

¶0 After being diagnosed with various progressive, degenerative diseases, Ward executed an advance directive instructing that her life not be extended by life-sustaining treatment, including artificially administered nutrition and hydration. Ward was later hospitalized and a PEG tube was inserted to provide artificially administered nutrition and hydration, contrary to the terms of her advance directive. After several guardianship proceedings, a trial was held on whether Ward's PEG tube should remain in place. The trial court held that revocation of an advance directive is weighed by the clear and convincing standard of proof. The Court of Civil Appeals reversed in part, finding that the proper standard of proof is preponderance of the evidence. On certiorari review, we hold that an incapacitated or incompetent person retains the legal right to revoke their advance directive and revocation of an advance directive is weighed by the clear and convincing standard of proof.

CERTIORARI PREVIOUSLY GRANTED; 
COURT OF CIVIL APPEALS OPINION VACATED;
TRIAL COURT AFFIRMED.

Robert B. Sartin, BARROW & GRIMM, P.C., Tulsa, Oklahoma and
James C. Milton, Jonathan L. Rogers, HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C., Tulsa, Oklahoma for Plaintiff/Appellant

Tadd J.P. Bogan, JONES, GOTCHER & BOGAN, P.C., Tulsa, Oklahoma for Defendant/Appellee W. Scott White

Jenny Proehl-Day, NEW DAY LEGAL, PLLC, Bixby, Oklahoma for Defendant/Appellee Allison White

OPINION

ROWE, V.C.J.:

BACKGROUND

¶1 Beginning in 2011, L.A.C. ("Ward") began suffering from various progressive, degenerative diseases.[1] Due to the progressive nature of her diagnoses and in an effort to plan her estate, Ward executed an Advance Directive for Health Care pursuant to 63 O.S. § 3101.4(A) on November 8, 2013.[2] The terms of Ward's Advance Directive state, in relevant part, the following:

(1) Terminal Condition. If I have a terminal condition, that is, an incurable and irreversible condition that even with the administration of life-sustaining treatment will, in the opinion of the attending physician and another physician, result in death within six (6) months:

...

(B) I direct that my life not be extended by life-sustaining treatment, including artificially administered nutrition and hydration.

...

(2) Persistently Unconscious. If I am persistently unconscious, that is, I have an irreversible condition, as determined by the attending physician and another physician, in which thought and awareness of self and environment are absent:

...

(B) I direct that my life not be extended by life-sustaining treatment, including artificially administered nutrition and hydration.

...

(3) End-Stage Condition. If I have an end-stage condition, that is, a condition caused by injury, disease, or illness, which results in severe and permanent deterioration indicated by incompetency and complete physical dependency for which treatment of the irreversible condition would be medically ineffective:

...

(B) I direct that my life not be extended by life-sustaining treatment, including artificially administered nutrition and hydration.

...

IV. General Provisions

...

d. In the absence of my ability to give directions regarding the use of life-sustaining procedures, it is my intention that this advance directive shall be honored by my family and physicians as the final expression of my legal right to choose or refuse medical or surgical treatment including, but not limited to, the administration of life-sustaining procedures, and I accept the consequences of such choice or refusal.

With time, Ward's physical condition began to worsen, and in March 2018 she lost her ability to speak.

¶2 Ward has two children, Allison White and Dr. W. Scott White ("Daughter" and "Son," collectively "Children"), and one sister, Amy Meyer ("Sister"), who are parties to this action. On May 12, 2021, Daughter was appointed Special Guardian on an Emergency Basis over Ward for a period of thirty days while Ward was hospitalized for aspiration pneumonia.[3] As Ward's special guardian, Daughter authorized the insertion of a percutaneous endoscopic gastronomy ("PEG") tube to hydrate and feed Ward, despite the terms of Ward's advance directive. Following her release from the hospital, Ward was moved to an assisted living facility where she continues to reside.

¶3 Sister filed an Objection to the appointment of Daughter as Ward's guardian, asserting she was named attorney in fact for Ward.[4] The trial court ultimately appointed an independent third party, Valerie Evans, Esq. ("GAL"), as Guardian Ad Litem for Ward.[5] Additionally, the trial court temporarily suspended Ward's Advance Directive and ordered that the PEG tube remain in place until the matter could be resolved.

¶4 Following the appointment of GAL, Children and Sister entered into a Settlement Agreement ("Agreement") in which they agreed to appoint Cara Wells, Esq., ("Guardian") as Guardian over Ward's person and property. Per the terms of the Agreement, the Guardian's primary responsibilities included: being an intermediary between the assisted-living facility and Ward's family, monitoring any Agreement violations, ensuring the parties comply with the Agreement, and consulting with Ward's family and court appointed attorney regarding long-term care facilities for Ward. Additionally, the parties agreed that the Advance Directive would remain in place and "[a]bsent discretionary action by [Ward's] physicians...there shall be no effort to remove the PEG tube, or withdraw nutrition or hydration, or accelerate [Ward's] death with medication of whatever kind."[6] On September 22, 2021, the trial court entered an Agreed Order Appointing General Guardian, where they found Ward to be an incapacitated person and adopted the terms of the parties' Agreement.

¶5 In her first report to the trial court, GAL noted Ward was nonverbal but cognizant and able to communicate via facial expressions, hand gestures, and by moving her feet. Based on her observations, GAL recommended that Ward's health care providers comply with her Advance Directive and remove the PEG tube. GAL concluded that "[Ward] is a proud woman. She is cognizant of what is happening around her. She is in the end stage of her life, and she is ready to go naturally. She would not want the peg tube."[7]

¶6 A second Guardian Ad Litem Report observed that Ward wanted the tube removed. According to the second report, Ward's hospice nurses "felt death to be imminent giving her days to weeks to live."[8] (GAL reported that Ward's treating physician, Dr. Carment, stated that Ward's condition had stabilized, and death was not imminent--"her condition is progressive, but he defines her level of care as palliative rather than end stage").[9]

¶7 Daughter filed an Emergency Motion seeking appointment as Successor Guardian of Ward, arguing, among other things, that the terms of the Agreement allowing the PEG tube to remain in place is in violation of Ward's Advance Directive.[10] Though Son objected to Daughter's request to become successor guardian of Ward, he agreed that the placement of Ward's PEG tube was in violation of her advance directive. Sister argued that the Agreement was conclusive and Ward's PEG tube should remain in place pursuant to the Agreement, regardless of the advance directive.

¶8 After the parties failed to mediate a resolution at Settlement Conference, trial began on April 13, 2022, on the issue of whether Ward's PEG tube should remain in place or be removed. Children argued that Ward's Advance Directive should be enforced, and the PEG tube should be removed. Conversely, Sister argued that Ward's PEG tube should not be removed, arguing Ward revoked her Advance Directive.

¶9 During trial, GAL testified that she visited Ward along with Ward's attorney and Guardian. GAL testified that:

[I]t appeared to us that she was saying that, yes, I'm -- I'm ready to go. That's what it appeared to us initially, but then we would ask again because we wanted to be sure, because this is a weighty -- weighty issue and her response, you know, is -- is critical in our view. And it was apparent she was getting tired. You know, she was starting to twitch more, so we gave her a break.[11]

 
During the break, the group spoke with Ward's hospice nurse who stated that removal of the PEG tube would cause Ward pain and that she would be aware she was starving to death. Ward's attorney, who was present at the meeting, testified that:

[W]e felt like we had an answer that, yes, she wanted that PEG tube to be removed. And then we took that break because we had a call from [the hospice nurse]. And when we came back we felt it was our obligation to tell her about the PEG tube removal.

. . .

In our opinion, at the beginning, before we took that break, it was hard to tell, but we thought that we had a yes answer. But afterwards it was -- we are very -- pretty sure that she does not want that PEG tub[e] removed because she doesn't want to feel the discomfort.[12]

¶10 After the group decided they needed to explain to Ward that removal of the PEG tube would cause pain, GAL stated that in her opinion and understanding of Ward's non-verbal expressions, Ward is "ready to go, but not ready to go by starving to death."[13] GAL concluded that Ward "wishes to continue to receive artificial hydration and nutrition through her PEG tube."[14] Dr. Carment, as well as the hospice nurse, testified that if the PEG tube were removed, they could administer medication that would help ease any discomfort. Dr. Carment testified that in his opinion, Ward was in an end-stage condition and had less than six months to live.

¶11 On May 17, 2022, the trial court entered a Journal Entry of Judgment where it held, in relevant part, the following:

13. It was further argued that [Ward] had revoked her 2013 Advance Directive shortly before trial. The Court finds that [Ward's] purported revocation was not free from serious doubt or highly probable. Proof of revocation failed to meet the clear and convincing standard. Even assuming arguendo that the evidentiary standard is a preponderance standard, the Court adopts [Son's] argument that even the preponderance of the evidence standard would not have been met to satisfy a showing or revocation of [Ward's] Advance Directive.

...

15. As a matter of first impression, the Court deems that the standard for revoking an advance directive requires clear and convincing evidence due to the prevalence of the clear and convincing standard generally used in Title 30 guardianship cases, and 63 O.S. § 3101 et seq., and 63 O.S. § 3131.1 et seq. requires clear and convincing evidence.

16. The Court notes that [Ward's] purported revocation of her 2013 Advanced Directive is not reflected in her medical records.

The trial court held that the placement of Ward's PEG tube violated the express terms of Ward's Advance Directive and ordered "[that the language of the Agreement which states] 'there shall be no effort to remove the PEG tube or withdraw nutrition or hydration' is set aside as stricken"[15] as it restricts the "public policy to allow for individual decision making with an advance health directive."[16]

¶12 On appeal, COCA held that preponderance of the evidence standard is the proper standard to revoke an advance directive and under that standard, the weight of the evidence shows Ward revoked her Advance Directive. We granted Children's petition for certiorari to address whether an incapacitated or incompetent person may revoke their advance directive and to define the standard of proof required for revocation of an advanced directive pursuant to 63 O.S. § 3101.6.

STANDARD OF REVIEW

¶13 On certiorari review, Children ask us to define the standard of proof for revocation of an advance directive pursuant to 63 O.S. § 3101.6 and to answer whether an incompetent person, Ward in this case, is capable of revoking an advance directive. Legal questions involving statutory interpretation are subject to de novo review. Casey v. Casey, 2005 OK 13, ¶ 7, 109 P.3d 345, 348. In exercising de novo review, we possess "plenary, independent, and non-deferential authority to examine the issues presented." Lee v. Bueno, 2016 OK 97, ¶ 6, 381 P.3d 736, 740. In an action at law before a trial judge as the trier of facts, "where there is any competent evidence reasonably tending to support the [judgment]...this Court will not disturb...the trial court's judgment based thereon." Florafax Intern., Inc. v. GTE Market Resources, Inc., 1997 OK 7, ¶ 13, 933 P.2d 282, 287.

DISCUSSION

A. An Incapacitated or Incompetent Person Retains the Legal Right to 
Revoke Their Advance Directive.

¶14 Children argue on appeal that Ward's incompetency renders her legally incapable of forming the necessary intent to revoke her advance directive. Under Title 63, an incompetent person is one who "has been declared legally incompetent to make decisions affecting medical treatment or care. . . ." 63 O.S. § 3080.2(4)(c). Here, Ward was declared incapacitated in the Guardianship proceeding. According to the Oklahoma Guardianship and Conservatorship Act:

Whenever in the Oklahoma Statutes the term "incompetent person" appears and refers to a person who has been found by a district court to be an incompetent person because of an impairment or condition...it shall have the same meaning as "incapacitated person" but shall not include a person who is a partially incapacitated person;

30 O.S. § 1-111(A)(12).

¶15 Under 63 O.S. 3101.6, "[a]n advance directive may be revoked in whole or in part at any time and in any manner...without regard to the declarant's mental or physical condition." 63 O.S. 3101.6(A) (emphasis added). Viewing the statutes in pari materia, we do not agree with Children that Ward is legally incapable of revoking her advance directive.

¶16 Pursuant to § 3101.6, our examination of a revocation should be independent of the declarant's mental or physical condition. Id. The Act does not place limitations on one's ability to revoke their advance directive. Specifically, the statute states that any evaluation of a revocation is made "without regard to the declarant's mental or physical condition." Id. We read the phrase "without regard to the declarant's mental or physical condition" to mean an incapacitated or incompetent person retains the legal right to revoke their advance directive. Id. Accordingly, we hold that Ward retains the legal right to revoke her advance directive, despite being legally incapacitated.

B. The Standard of Proof Required for Revocation of an Advance 
Directive Under 63 O.S. 3101.6 is Clear and Convincing Evidence.

¶17 Children argue that, in the absence of statutory language mandating a requisite standard of proof, and when an individual interest is at stake, we must follow the clear and convincing standard when analyzing the revocation of an advance directive. The clear and convincing standard is a "measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." Matter of Adoption of M.A.S., 2018 OK 1, ¶ 11, 419 P.3d 204, 208. Additionally, Children argue that the Fourteenth Amendment of the United States Constitution protects the right to refuse unwanted medical treatment, including refusal of life-sustaining measures as stated in Cruzan, and that Ward has exercised that right in her Advance Directive. (Cruzan v. Dir. Missouri Dept. of Health, 497 U.S. 261, 278 (1990)).

¶18 Sister argues to the contrary that there is an overarching policy in Title 63 favoring the provision of life-sustaining treatment, which is indicative of the Legislature's intent to impose a more lenient standard of proof when analyzing the revocation of an advance directive.[17] Sister further argues that the text of § 3101.6, stating that an advance directive may be revoked "at any time and in any manner," suggests that the proper standard of proof is a preponderance of the evidence standard. 63 O.S. § 3101.6(A). Preponderance of the evidence means that upon reviewing all evidence in the case, the proposition asserted by the party with the standard of proof is more likely true than not.[18]

¶19 We look to the words of the statute to glean legislative intent:

The goal of any inquiry into the meaning of a statutory enactment is to ascertain and give effect to the intent of the legislature. The law-making body is presumed to have expressed its intent in a statute's language and to have intended what the text expresses. If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates. Only where the intent cannot be ascertained from a statute's text, as when ambiguity or conflict (with other statutes) is shown to exist, may rules of statutory construction be employed.

Yocum v. Greenbriar Nursing Home, 2005 OK 27, ¶ 9, 130 P.3d 213, 219 (internal citations omitted).

¶20 Accordingly, to determine the standard required for revocation of an advance directive, we must look to the text of 63 O.S. § 3101.6, which states:

A. An advance directive may be revoked in whole or in part at any time and in any manner by the declarant, without regard to the declarant's mental or physical condition. A revocation is effective upon communication to the attending physician or other health care provider by the declarant or a witness to the revocation.

B. The attending physician or other health care provider shall make the revocation a part of the declarant's medical record.

63 O.S. § 3101.6.

¶21 The legislative purpose of the Oklahoma Advance Directive Act ("Act") recognizes the right of an individual to control their own medical care, including the right to decline treatment or direct that it be withdrawn, and to acknowledge that that right is protected by the Constitution of the United States. 63 O.S. § 3101.2(A)(1)-(2). The Act states:

A. The purpose of the Oklahoma Advance Directive Act is to:

1. Recognize the right of individuals to control some aspects of their own medical care and treatment, including but not limited to the right to decline medical treatment or to direct that it be withdrawn, even if death ensues;

2. Recognize that the right of individuals to control some aspects of their own medical treatment is protected by the Constitution of the United States and overrides any obligation the physician and other health care providers may have to render care or to preserve life and health;

3. Recognize that decisions concerning one's medical treatment involve highly sensitive, personal issues that do not belong in court, even if the individual is incapacitated, so long as a proxy decision-maker can make the necessary decisions based on the known intentions, personal views, or best interests of the individual. If evidence of the individual's wishes is sufficient, those wishes should control; if there is not sufficient evidence of the individual's wishes, the proxy's decisions should be based on the proxy's reasonable judgment about the individual's values and what the individual's wishes would be based upon those values. The proper role of the court is to settle disputes and to act as the proxy decision-maker of last resort when no other proxy is authorized by the individual or is otherwise authorized by law;

4. Restate and clarify the law to ensure that the individual's advance directive for health care will continue to be honored during incapacity without court involvement; and

5. Encourage and support health care instructions by the individual in advance of incapacity and the delegation of decision-making powers to a health care proxy.

63 O.S. § 3101.2(A) (emphasis added).

¶22 Our reading of § 3101.6 must be compatible with the overarching lens that the Legislature intended to protect an individual's right to have autonomy over their own health care and respect an individual's wishes as expressed in their advance directive. If an individual has an advance directive that states their preferences for their end-of-life care, the statute directs the individual's wishes will be honored during incapacity without court involvement.[19] Because the statute requires that we show great deference to the wishes of an individual as expressed in their advance directive, we find that a higher standard of proof is necessary to support a revocation of an advance directive.

¶23 Although the text of § 3101.6 does not explicitly set out a standard of proof for revocation of an advance directive, other related statutes within Title 63 section require a clear and convincing standard. "Different statutes on the same subject are generally to be viewed as in pari materia and must be construed as a harmonious whole." Taylor v. State Farm Fire and Cas. Co., 1999 OK 44, ¶ 19, 981 P.2d 1253, 1261. "All legislative enactments in pari materia are to be interpreted together as forming a single body of law that will fit into a coherent symmetry of legislation." Id. The conclusion that clear and convincing evidence is the required standard for revocation is supported by other acts in Title 63 that deal with end-of-life care.

¶24 In the Hydration and Nutrition for Incompetent Patients Act,[20] there is a presumption that "every incompetent patient has directed his health care providers to provide him with hydration and nutrition to a degree that is sufficient to sustain life." 63 O.S. § 3080.3. However, that presumption can be overcome by "clear and convincing evidence that the patient, when competent, decided on the basis of information sufficient to constitute informed consent that artificially administered hydration or artificially administered nutrition should be withheld or withdrawn from him. . . ." 63 O.S. § 3080.4(A)(2). Additionally, the Hydration and Nutrition for Incompetent Patients Act states that the presumption is overcome by an "advance directive [that] has been executed pursuant to the Oklahoma Advance Directive Act specifically authorizing the withholding or withdrawal of nutrition and/or hydration." 63 O.S. § 3080.4(A)(5).[21]

¶25 The Oklahoma Do-Not-Resuscitate Act echoes a similar sentiment, affirming that life-sustaining measures should not be used when an attending physician of an incapacitated person "knows by clear and convincing evidence that the incapacitated person, when competent, decided on the basis of information sufficient to constitute informed consent that the person would not have consented to the administration of cardiopulmonary resuscitation. . . ." 63 O.S. § 3131.4(A)(4). Although we agree with Sister that the overall policy behind Title 63 favors life-sustaining measures, applying a lower standard of proof would hinder the statute's explicit provisions allowing Ward to override her healthcare providers' obligation to preserve her life.

¶26 Additionally, Sister argues that the language of § 3101.6 allowing revocation "at any time and in any manner...without regard for the declarant's mental or physical condition" indicates the Legislature's intent to lower the standard of proof. 63 O.S. § 3101.6(A). We read this language as addressing how one may revoke an advance directive, rather than being indicative of the proof required to support a finding of revocation. We do not consider the statute's lack of exacting requirements regarding the manner of revocation as lowering the bar for determining whether or not a revocation has occurred. The Act allows for revocation of an advance directive by whatever means available, so long as the act of revocation is sufficiently clear and convincing. The legislative intent of the Advance Directive Act is clear: we must recognize the right of an individual to refuse medical care and treatment, and ensure that in the event of incapacity, that right is honored. 63 O.S. § 3101.2. Based on our reading of Title 63, the revocation of an advance directive must be weighed by the clear and convincing evidence standard.

¶27 Our reading of § 3101.6 is also consistent with Constitutional mandates regarding end-of-life-care. The United States Supreme Court has stated that the right to refuse unwanted medical treatment is protected by the United States Constitution. Cruzan, 497 U.S. at 278. In Cruzan, the United States Supreme Court addressed whether the United States Constitution prohibited a state from requiring clear and convincing evidence as the standard when a guardian sought to discontinue life sustaining measures for a person in an unresponsive state. Id. at 284. The Court in Cruzan "mandated an intermediate standard of proof--'clear and convincing evidence'--when the individual interest at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" Id. at 282.

¶28 We similarly reiterated this sentiment where we discussed removal of life sustaining therapy for an infant and agreed that "the clear and convincing evidence standard is traditionally applied in equity for allocation of the risk of error when important interests are at stake." Baby F. v. Oklahoma County Dist. Court, 2015 OK 24, ¶ 19, 348 P.3d 1080, 1087. In Baby F, we required that, prior to withdrawing life-sustaining medical treatment on behalf of a child in state custody, the trial court must determine by clear and convincing evidence that doing so is in the best interest of the child. Id. ¶ 24, 348 P.3d at 1088-89.

¶29 In the present case, if the court fails to find Ward revoked her advance directive, the potential consequence is the hastening of her death. In other words, in this case, the lower preponderance standard might actually promote the preservation of life. Even so, applying the preponderance of evidence standard to revoking an advance directive is contrary to § 3106's explicit intent. The purpose of § 3101.6 is to allow an individual to make their own end-of-life decisions, of their own free will. This requires that Ward's expressed wishes regarding her end-of-life treatment will continue to be honored during her incapacity without court involvement. 63 O.S. § 3101.2(A)(4). Ward consciously chose not to prolong her life through artificial nutrition and hydration after being diagnosed with various progressive, degenerative diseases that she knew would ultimately lead to her death. And although Title 63 provides that life-sustaining treatment will be provided absent an election otherwise, the statute explicitly protects an individual's right to withdraw medical treatment "even if death ensues." 63 O.S. § 3101.2(A).

CONCLUSION

¶30 The Oklahoma Advance Directive Act requires that Ward's advance directive for health care be honored during incapacity without court involvement. The trial judge properly weighed the evidence before him and his judgment was supported by competent evidence. We hold that an incapacitated or incompetent person retains the legal right to revoke their advance directive. We further hold that 63 O.S. § 3101.6 requires a clear and convincing standard of proof for the revocation of an advance directive.

CERTIORARI PREVIOUSLY GRANTED; 
COURT OF CIVIL APPEALS OPINION VACATED; 
TRIAL COURT AFFIRMED.

Rowe, V.C.J., Kauger, J. (by separate writing), Winchester, Edmondson, Combs, Gurich and Kuehn, JJ., concur.

Darby, J. (by separate writing), concurs in result.

Kane, C.J. (by separate writing), dissents.

FOOTNOTES

[1] Among other things, Ward is impaired by acute Respiratory Failure, Corticobasal Degeneration, Parkinson's Disease and Dementia.

[2] It is undisputed that at the time she executed her Advance Directive, Ward was competent to do so.

[3] This is the second guardianship proceeding involving Ward, the first proceeding was brought by Daughter in December 2011. In the 2011 proceeding, Ward contested the appointment of a guardian, and the proceeding was eventually dismissed on September 14, 2013.

[4] Sister was named attorney in fact for Ward in Ward's Durable Power of Attorney for Healthcare and in Ward's Durable Power of Attorney for Property, both executed in 2013.

[5] Under the Oklahoma Guardianship and Conservatorship Act, a guardian ad litem is appointed to be an advocate "on behalf of the vulnerable adult and act as an officer of the court to investigate all matters concerning the best interests of the vulnerable adult." 30 O.S. § 3-106.1(C)(4). Part of the responsibilities of a guardian ad litem include presenting the court with "written reports on the vulnerable adult's best interests that include conclusions and recommendations, and the facts upon which they are based." Id. at § 3-106.1(C)(4)(e).

[6] Agreed Order Appointing General Guardian (September 22, 2021) (Exhibit A, Settlement Agreement at ¶ 6).

[7] Guardian Ad Litem Report (September 8, 2021).

[8] Guardian Ad Litem Report (February 1, 2022).

[9] Id.

[10] The Emergency Motion seeking Daughter's appointment as a successor guardian was objected to by Son, Guardian, Sister, and Ward's attorney acting on her behalf.

[11] Transcript of Proceeding at 15 (April 19, 2022).

[12] Transcript of Proceeding at 28-30 (April 20, 2022).

[13] Transcript of Proceeding at 18 (April 19, 2022).

[14] GAL read a third Guardian Ad Litem Report into the trial record stating the following: "In light of an exhaustive and intense meeting, I believe all three counsel, in our respective capacities to the ward and this Court, are confident in voicing her intent that she wishes to continue to receive artificial hydration and nutrition through her PEG tube." Id.

[15] Journal Entry of Judgment, Finding 21 (May 17, 2022).

[16] Id. Finding 20.

[17] Sister references the Hydration and Nutrition for Incompetent Patients Act which states that "[i]t shall be presumed that every incompetent patient has directed his health care providers to provide him with hydration and nutrition to a degree that is sufficient to sustain life." 63 O.S. § 3080.3.

[18] Oklahoma Uniform Jury Instruction -- OUJI-CIV 3.1 BURDEN OF PROOF- GREATER WEIGHT OF THE EVIDENCE provides, in relevant part: "considering all the evidence in the case, that the proposition on which such party has the burden of proof is more probably true than not true."

[19] 63 O.S. § 3101.2(A)(4).

[20] 63 O.S. §§ 3080.1 et seq.

[21] We agree with the trial court that the presumption stated in the Hydration and Nutrition for Incompetent Patients Act does not apply to L.A.C. in this case because she was competent when she decided that artificially administered hydration and nutrition should be withheld or withdrawn from her on the basis of information sufficient to constitute informed consent; and that L.A.C., while competent, executed an advance directive instructing that her life not be extended by artificially administered hydration and nutrition.

 

 

KAUGER, J., concurring specially, with whom Combs, J., joins:

¶1 The Oklahoma Advance Directive Act requires that Ward's advance directive for health care be honored during incapacity without court involvement. Because of the unavoidable length of time this appeal has taken and its potential impact on the Ward's present wishes, remand to the trial court for an evidentiary hearing consistent with this opinion is necessary.

 

 

Darby, J., concurring in result:

¶1 The fact that all human life is precious, even miraculous, is not lost on me. When we as family watch life slip away for someone we love our hurt is real. And when the caretaker turns to the family to make these end-of-life decisions on behalf of our loved one it really wrenches the gut. Even so, ten out of ten still die.

¶2 Ward in this case, known to us only as L.A.C., prepared for the inevitable and while still fully competent signed the advance directive in an effort to tell the world what she wanted done, or not done, if a time would come when she could no longer competently decide for herself.

¶3 I concur in the Court's decision to vacate the Court of Appeals Opinion and affirm the trial court. I concur in the Court's decision to hold that the correct burden of proof regarding revocation of an advance directive is clear and convincing evidence. I concur in the Court's affirming the trial court's finding that Appellants did not meet the required burden of proof to show L.A.C. revoked her advance directive.

¶4 Under the heading "Living Will" the directive states:

If my attending physician and another physician determine that I am no longer able to make decisions regarding my medical treatment, I direct my attending physician and other health care providers, pursuant to the Oklahoma Advance Directive Act, to follow my instructions as set forth below:

L.A.C. knew what the doctors expected for her. So, she had prepared, then signed, the advance directive. Advance directives not only instruct how to care for her, they attempt to relieve the declarant's family of the burden of making those decisions. I do not fault L.A.C.'s daughter for authorizing the insertion of the PEG tube "despite the terms of Ward's advance directive." (Majority Opinion par. #2). The daughter's decision is not uncommon. I likely would have done the same. But daughter did not do what her mother directed.

¶5 L.A.C., I must conclude, signed the advance directive in hopes of preventing precisely all that has in fact happened. I commend the trial court because the judge followed the law, as he swore he would when he became a judge. I am confident the judge experienced the pressure that comes with the responsibility of deciding cases like this. It is not easy.

¶6 Attorneys, estate planners, and anyone signing an advance directive should take note of this opinion and give further directions should a situation such as this occur for a declarant and their family.

¶7 I respectfully concur in result.

 

 

KANE, C.J., dissenting:

¶1 I disagree with the Majority's method of construing 63 O.S., § 3101.6 to arrive at the conclusion that the burden of proof for revoking an advance directive is clear and convincing evidence. I believe the statutory language clearly supports a preponderance of the evidence burden of proof for revoking an advance directive.

The Burden of Proof for Revoking an Advance Directive Under
63 O.S., § 3101.6 is a Preponderance of the Evidence

¶2 Not all advance directives decline life-sustaining treatment. Many provide for it. The Oklahoma Advance Directive Act provides: "An individual of sound mind and eighteen (18) years of age or older may execute at any time an advance directive for health care governing the provision, withholding, or withdrawal of life-sustaining treatment." 63 O.S.2011, § 3101.4(A) (emphasis added). We are tasked with establishing the burden of proof for revoking an advance directive. Let us be cognizant that whatever burden of proof is established in this case will apply to the revocation of every advance directive--whether the advance directive expresses the patient's wishes that life-sustaining treatment be withheld or withdrawn under certain circumstances or that all life-sustaining treatment be provided under any conditions or something in between. This is a pure question of law. The Court should resist the urge to fashion a common law burden of proof based on the facts and result in this specific case.[1]

¶3 Rather, I first seek the aid of the language of the statute, itself, to establish a burden of proof that effectuates the legislative intent ascertained from the plain and ordinary meaning of the statute. Title 63, § 3101.6 of the Oklahoma Advance Directive Act provides:

A. An advance directive may be revoked in whole or in part at any time and in any manner by the declarant, without regard to the declarant's mental or physical condition. A revocation is effective upon communication to the attending physician or other health care provider by the declarant or a witness to the revocation.

B. The attending physician or other health care provider shall make the revocation a part of the declarant's medical record.

63 O.S.2011, § 3101.6 (emphasis added). The statutory language "at any time and in any manner" and "without regard to the declarant's mental or physical condition" clearly indicates the Legislature intended for it to be very easy for a patient to revoke or modify his or her advance directive. 63 O.S., § 3101.6(A). A more lenient burden of proof is consistent with the statutory language. Sister makes this argument, and the Majority Opinion dismisses it without much explanation. See Maj. Op. ¶ 26. To me, there is no need--and, in fact, it is inappropriate--to, as the Majority does, look to provisions in other Acts in other Chapters of Title 63 to determine the burden of proof for revoking an advance directive when a lesser burden of proof is so obviously contemplated in the text of 63 O.S., § 3101.6(A).

¶4 The preponderance of the evidence burden of proof is also supported by the Majority's other holding in this case--that according to the clear and unambiguous language "without regard to the declarant's mental or physical condition," an incompetent or incapacitated person retains the right to revoke her advance directive. While one must be competent to execute an advance directive, one does not need to be competent to revoke it.[2] Answer me this: Would an incompetent or incapacitated patient ever be able to revoke an advance directive by clear and convincing evidence? Would an incompetent or incapacitated patient's revocation ever be free from serious doubt? Not likely. It is nearly impossible to get clear and convincing evidence of a revocation, which is free from serious doubt, from an incompetent or incapacitated person. Requiring clear and convincing evidence would make an incapacitated or incompetent patient's advance directive practically irrevocable and render the language "without regard to the declarant's mental or physical condition" meaningless. Because competency is not required to revoke, it only makes sense that a lower burden of proof is required.

¶5 Finally, contrary to the Majority's assertions, a lower burden of proof for revoking an advance directive is actually consistent with the purpose of the Oklahoma Advance Directive Act, which is to recognize the statutory right of individuals to control their own medical care. See 63 O.S.2011, § 3101.2(A)(1). Autonomy over one's medical care includes the right to change one's mind about life-sustaining treatment. This statutory purpose is also evidenced by the language used in 63 O.S.2011, § 3101.8(A): "A patient may make decisions regarding life-sustaining treatment as long as the patient is able to do so." The language used in 63 O.S., § 3101.6 and § 3101.8, combined with the Act's purpose to give patient's control over their care, supports the more lenient preponderance of the evidence burden of proof for revoking an advance directive.

¶6 As I stated earlier, revocation is revocation without regard to the directives contained therein. But, with the use of such lenient language, I can't help but think the revocation provision was drafted with a particular scenario in mind: a person executes an advance directive that says not to extend his life with life-sustaining treatment but, when actually faced with death, changes his mind and wishes to prolong his life. The lenient language in the revocation provision is intended to safeguard that person's right to control his own medical care, including the right to change his mind and fight for or sustain his own life--even if that person is incapacitated or incompetent. Why trust an incapacitated or incompetent person's decision to revoke the advance directive declining life-sustaining treatment that he executed when he was of sound mind? Because death is irreparable. As noted by the Court of Civil Appeals, the decision to terminate life-sustaining treatment is obviously not capable of reconsideration once death has occurred.

¶7 In the present case, the distinction between the clear and convincing and preponderance of the evidence burdens of proof may seem irrelevant, as the trial court concluded that the evidence was insufficient to continue administering life-sustaining treatment under either burden of proof, but in future cases, the distinction will be crucial. In a scenario where the finder of fact concludes that by a preponderance of the evidence, i.e. that it is most likely, that a patient has changed his mind and now wishes (contrary to his advance directive) to sustain his life, it would be constitutionally abhorrent for this Court to disregard the patient's established wishes and allow life-sustaining measures to terminate upon a finding that the vulnerable citizen probably wanted to live, but was unable to meet the heightened standard, set by this Court, to sustain his own life.

¶8 For these reasons, I would hold that the burden of proof for revoking an advance directive pursuant to 63 O.S., § 3101.6 is a preponderance of the evidence.

The Majority's Misplaced Reliance on 63 O.S., § 3080.4(A)(2) of the 
Hydration and Nutrition for Incompetent Patients Act and
63 O.S., § 3131.4(A)(4) of the Oklahoma Do-Not-Resuscitate Act 

¶9 The Majority's analysis relies heavily on the statutorily-defined clear and convincing evidence burden of proof articulated in 63 O.S.2011, § 3080.4(A)(2) of the Hydration and Nutrition for Incompetent Patients Act and 63 O.S.2011, § 3131.4(A)(4) of the Oklahoma Do-Not-Resuscitate Act. See Maj. Op. ¶¶ 23-25. Its reliance on these two provisions is misplaced. This becomes clear when 63 O.S., § 3080.4(A)(2) and 63 O.S., § 3131.4(A)(4) are examined in context. These provisions set forth the burden of proof for rebutting the presumption in favor of life-sustaining treatment when there is no advance directive. They have nothing to do with revoking an advance directive.

The Presumption for Life-Sustaining Treatment and Rebutting the 
Presumption

¶10 When a court considers the proposed termination of life-sustaining treatment, including the withdrawal of artificially administered nutrition and hydration, it must begin with the presumption that the patient would choose to defend his or her own life. The Hydration and Nutrition for Incompetent Patients Act provides: "It shall be presumed that every incompetent patient has directed his health care providers to provide him with hydration and nutrition to a degree that is sufficient to sustain life." 63 O.S.2011, § 3080.3. The Oklahoma Do-Not-Resuscitate Act provides: "Every person shall be presumed to consent to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest . . . ." 63 O.S.2011, § 3131.4(A). These Acts clearly state there is a presumption in favor of life-sustaining treatment.

¶11 This presumption may, however, be rebutted. The Legislature has set forth thirteen ways the presumption may be rebutted.[3] Stated another way, the Legislature has set forth thirteen exceptions to the obligation to provide life-sustaining treatment to a patient. One way to rebut this presumption is with an advance directive specifically declining life-sustaining treatment. See 63 O.S., § 3080.4(A)(3)-(5); 63 O.S., § 3131.4(A)(6).

¶12 The two provisions relied upon by the Majority--63 O.S., § 3080.4(A)(2) and 63 O.S., § 3131.4(A)(4)--provide two other ways to overcome the presumption for life-sustaining treatment. Title 63, § 3080.4(A)(2) of the Hydration and Nutrition for Incompetent Patients Act provides:

A. The presumption pursuant to Section 3080.3 of this title shall not apply if:

. . .

2. A court finds by clear and convincing evidence that the patient, when competent, decided on the basis of information sufficient to constitute informed consent that artificially administered hydration or artificially administered nutrition should be withheld or withdrawn from him . . . .

63 O.S., § 3080.4(A) (emphasis added). Title 63, § 3131.4(A)(4) of the Oklahoma Do-Not-Resuscitate Act provides:

A. Every person shall be presumed to consent to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest, unless one or more of the following conditions, of which the health care provider has actual knowledge, apply:

. . .

4. An attending physician of an incapacitated person without a representative knows by clear and convincing evidence that the incapacitated person, when competent, decided on the basis of information sufficient to constitute informed consent that the person would not have consented to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest. Clear and convincing evidence for this purpose shall include oral, written, or other acts of communication between the patient, when competent, and family members, health care providers, or others close to the patient with knowledge of the patient's personal desires . . . .

63 O.S., § 3131.4(A) (emphasis added).

¶13 Borrowing the clear and convincing burden of proof from these provisions located in other Acts is inappropriate for a couple of reasons. First, these provisions set forth the burden of proof for rebutting the presumption in favor of life-sustaining treatment when there is no advance directive. They have nothing to do with revoking an advance directive. An advance directive is just one of several ways to rebut the presumption for life-sustaining treatment. We have that here.[4] What we care about is the burden of proof for revoking such an advance directive. These provisions don't tell us that. They detail other ways the presumption may be rebutted if there isn't an advance directive.

¶14 Second, the heightened clear and convincing evidence burden of proof in these statutes is paired with a competency requirement. For the presumption to be rebutted by clear and convincing evidence, the patient must be competent at the time she expressed her wishes that artificially administered hydration and nutrition be withheld or withdrawn and must be competent at the time she expressed her wishes to not be resuscitated. See 63 O.S., § 3080.4(A)(2); 63 O.S., § 3131.4(A)(4). When clear and convincing evidence is required, so is competency. The Majority held that the revocation statute does not require competency. In this regard, the two provisions relied on by the Majority actually support a more lenient burden of proof for revocation, because competency is not required to revoke an advance directive.

¶15 For these reasons, I am not persuaded that the clear and convincing burden of proof found in these irrelevant provisions should inform our determination of a common law burden of proof for the revocation of an advance directive.

¶16 My conclusion that the burden of proof for revoking an advance directive is a preponderance of the evidence does not offend the clear and convincing evidence burden of proof for terminating life-sustaining treatment as suggested by the Majority. The United States Supreme Court and this Court have recognized that clear and convincing evidence is required to terminate life-sustaining treatment, not to prolong life. See Cruzan v. Missouri Dept. of Health, 497 U.S. 261, 282-84 (1990); In re Baby F, 2015 OK 24, ¶ 24, 348 P.3d 1080, 1088-89. While only a preponderance of the evidence is needed to revoke the advance directive, clear and convincing evidence continues to be needed to rebut the presumption that a patient wants to live. Revoking a directive that declines life-sustaining treatment results in prolonging life. Revoking a directive that provides for life-sustaining treatment does not automatically decline life-sustaining treatment. We simply return to the presumptive state without an advance directive. Life-sustaining treatment continues until it is rebutted pursuant to 63 O.S., § 3080.4(A)(1)-(7) or 63 O.S., § 3131.4(A)(1)-(6).

¶17 I respectfully dissent.

FOOTNOTES

[1] The Court of Civil Appeals also made this mistake. While I agree with the COCA's conclusion that the proper burden of proof is a preponderance of the evidence, I disagree with the COCA's reasoning. Rather than answer the pure question of law, the COCA looked to the circumstances in this case and reasoned that, because revocation would result in the preservation of the Ward's life, a more lenient burden of proof for revoking an advance directive applied. This seems to suggest that if the advance directive had expressed patient's wishes to receive all life-sustaining treatment under any conditions, the heightened clear and convincing evidence burden of proof would have applied to revocation. The law does not support establishing different common law burdens of proof based on the terms of the advance directive. The burden of proof for revoking an advance directive under 63 O.S., § 3101.6 is the same, regardless of the directives contained therein. For reasons discussed later in this opinion, a more lenient burden of proof for revoking an advance directive does not, in any way, alter the firmly established clear and convincing evidence burden of proof for declining life-sustaining treatment.

[2] An advance directive can only be executed by a competent adult. The advance directive governs in the event the once competent adult becomes incapacitated or incompetent and is no longer able to make informed decisions about her health care. An advance directive governs only when the patient is incapacitated or incompetent. The statutory language in 63 O.S., § 3101.6(A) is crystal clear: an incapacitated or incompetent person may revoke her advance directive (which instructs what to do if she becomes incapacitated or incompetent). As nonsensical as this sounds, I accept the clear and unambiguous meaning of the statute.

[3] The Hydration and Nutrition for Incompetent Patients Act provides:

A. The presumption pursuant to Section 3080.3 of this title shall not apply if:

1. The attending physician of the incompetent patient knows that the patient, when competent, decided on the basis of information sufficient to constitute informed consent that artificially administered hydration or artificially administered nutrition should be withheld or withdrawn from him;

2. A court finds by clear and convincing evidence that the patient, when competent, decided on the basis of information sufficient to constitute informed consent that artificially administered hydration or artificially administered nutrition should be withheld or withdrawn from him;

3. An advance directive has been executed pursuant to the Oklahoma Natural Death Act specifically authorizing the withholding or withdrawal of nutrition and/or hydration;

4. An advance directive has been executed pursuant to the Oklahoma Rights of the Terminally Ill or Persistently Unconscious Act specifically authorizing the withholding or withdrawal of nutrition and/or hydration;

5. An advance directive for health care has been executed pursuant to the Oklahoma Advance Directive Act specifically authorizing the withholding or withdrawal of nutrition and/or hydration;

6. In the reasonable medical judgment of the incompetent patient's attending physician and a second consulting physician, artificially administered hydration or artificially administered nutrition will itself cause severe, intractable, and long-lasting pain to the incompetent patient or such nutrition or hydration is not medically possible; or

7. In the reasonable medical judgment of the incompetent patient's attending physician and a second consulting physician:

a. the incompetent patient is chronically and irreversibly incompetent,

b. the incompetent patient is in the final stage of a terminal illness or injury, and

c. the death of the incompetent patient is imminent.

63 O.S.2011, § 3080.4(A).

The Oklahoma Do-Not-Resuscitate Act provides:

A. Every person shall be presumed to consent to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest, unless one or more of the following conditions, of which the health care provider has actual knowledge, apply:

1. The person has notified such person's attending physician that such person does not consent to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest and that notification has been entered in the patient's medical records;

2. The parent or guardian of a minor child, after consultation with the minor child's attending physician, has notified the minor child's attending physician that the parent or guardian does not consent to the administration of cardiopulmonary resuscitation in the event of the minor child's cardiac or respiratory arrest, and that the minor child, if capable of doing so and possessing sufficient understanding and appreciation of the nature and consequences of the treatment decision despite the minor child's chronological age, has not objected to this decision of the parent or guardian, and such notification has been entered in the minor child's medical records; provided, medically indicated treatment may not be withheld from a disabled infant with life-threatening conditions to the extent that such medically indicated treatment is required by federal law or regulations as a condition for the receipt of federally funded grants to this state for child abuse and neglect prevention and treatment programs;

3. An incapacitated person's representative has notified the incapacitated person's attending physician that the representative, based on the known wishes of the incapacitated person, does not consent to the administration of cardiopulmonary resuscitation in the event of the incapacitated person's cardiac or respiratory arrest and that notification has been entered in the patient's medical records;

4. An attending physician of an incapacitated person without a representative knows by clear and convincing evidence that the incapacitated person, when competent, decided on the basis of information sufficient to constitute informed consent that the person would not have consented to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest. Clear and convincing evidence for this purpose shall include oral, written, or other acts of communication between the patient, when competent, and family members, health care providers, or others close to the patient with knowledge of the patient's personal desires;

5. A do-not-resuscitate consent form in accordance with the provisions of the Oklahoma Do-Not-Resuscitate Act has been executed for that person; or

6. An executed advance directive for health care, or other document recognized by the Oklahoma Rights of the Terminally III or Persistently Unconscious Act, directing that life-sustaining treatment not be performed in the event of cardiac or respiratory arrest, is in effect for that person, pursuant to the provisions of paragraph 1 of Section 3101.3 or Section 3101.14 of this title.

63 O.S.2011, § 3131.4(A).

[4] Whether the Ward rebutted the presumption for life-sustaining treatment is not at issue in this case. That was accomplished by her 2013 advance directive.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1997 OK 7, 933 P.2d 282, 68 OBJ 306, 
Florafax International, Inc. v. GTE Market Resources, Inc.
Discussed

 
2005 OK 13, 109 P.3d 345, 
CASEY v. CASEY
Discussed

 
2005 OK 27, 130 P.3d 213, 
YOCUM v. GREENBRIAR NURSING HOME
Discussed

 
2015 OK 24, 348 P.3d 1080, 
BABY F. v. OKLAHOMA COUNTY DISTRICT COURT
Discussed at Length

 
2016 OK 97, 381 P.3d 736, 
LEE v. BUENO
Discussed

 
2018 OK 1, 419 P.3d 204, 
IN THE MATTER OF THE ADOPTION OF M.A.S.
Discussed

 
1999 OK 44, 981 P.2d 1253, 70 OBJ 1664, 
Taylor v. State Farm Fire and Casualty Co.
Discussed

Title 30. Guardian and Ward

 
Cite
Name
Level

 
30 O.S. 1-111, 
Definitions
Cited

Title 63. Public Health and Safety

 
Cite
Name
Level

 
63 O.S. 3080.1, 
Short Title
Cited

 
63 O.S. 3080.2, 
Definitions
Cited

 
63 O.S. 3080.3, 
Presumption Involving Incompetent Patient's Health Care Providers
Discussed at Length

 
63 O.S. 3080.4, 
Inapplicability of Presumption
Discussed at Length

 
63 O.S. 3101, 
Repealed
Cited

 
63 O.S. 3101.2, 
Purpose
Discussed at Length

 
63 O.S. 3101.6, 
Revocation of Advance Directive
Discussed at Length

 
63 O.S. 3101.8, 
Right to Make Life-Sustaining Treatment Decisions - Alleviation of Pain - Pregnant Patient
Cited

 
63 O.S. 3131.1, 
Short Title
Cited

 
63 O.S. 3131.4, 
Presumption of Consent to Administration of Cardiopulmonary Resuscitation - Conditions of Exception
Discussed at Length

 
63 O.S. 3101.4, 
Advance Directive Form and Procedures
Discussed

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA